# CHARLESTON.

FIDELITY INS. TRUST AND SAFE DEPOSIT CO. *v.* SHENANDOAH
VALLEY RAILROAD CO.

*(LUCAS, JUDGE, Absent.)

Submitted January 28, 1890—Decided March 20, 1890.

| 33 | 761 |
| 34 | 121 |
| 33 | 761 |
| 35 | 30 |
| 33 | 761 |
| 38 | 399 |
| 33 | 761 |
| 40 | 642 |
| 40 | 649 |
| 33 | 761 |
| 53 | 435 |
| 33 | 761 |
| 55 | 588 |

1. EXECUTORY AGREEMENT—BONDS AND MORTGAGES—PRIORITIES
—COMPENSATION.

The C. I. Co. holds first mortgage bonds under a mortgage, dated in 1872, given by the S. V. R'd Co.; and the two companies make an executory agreement providing that the bonds held by the C. I. Co. shall be cancelled, and in place of them the S. V. R'd Co. shall issue and deliver to the C. I. Co. second mortgage bonds, which are to be subject to certain first mortgage bonds specified in the agreement to be issued by the S. V. R'd Co. to go to other parties, to complete the railroad of the S. V R'd Co. Under the agreement, the bonds under the mortgage of 1872 are cancelled, and a release of that mortgage is made by the trustee therein. Then the S. V. R'd Co. executes three mortgages on its property, the trustee therein having notice of the right of the C. I. Co. under said agreement. It never delivered to the C. I. Co. the second mortgage bonds called for by said agreement. The C. I. Co. is held entitled to equitable compensation under such agreement for the failure of the S. V. R'd Co. to deliver such second mortgage bonds. *Held,* that by force of such agreement, notwithstanding the failure to deliver such second mortage bonds, the equitable compensation for such failure decreed to the C. I. Co. must be subject to the first mortgage bonds to which such agreement made the second mortgage bonds subject; and it can not be accorded priority over such bonds by reason of the mortgage of 1872.

2. EXECUTORY AGREEMENT—BONDS AND MORTGAGES—PRIORITIES
—COMPENSATION.

The C. I. Co. repudiated such agreement, and claimed as for the said cancelled bonds, and did not demand such second mortgage bonds, and never claimed any compensation under said agreement for failure to deliver the second mortgage bonds until after a decree holding it bound by said agreement. For this reason, though, had such bonds been delivered according to the agreement, they could have been sold by the C. I. Co. at par, and that company is thus damaged by such failure to deliver the bonds, yet these facts will not give it preference for the compensation decreed it over the first mortgage bonds, to which the

*Counsel below.
96

agreement makes such second mortgage bonds subject, notwithstanding such position of subordination may entail great loss to the C. I. Co., as compared with what it would have realized by a sale of the second mortgage bonds, had they been delivered.

3. EXECUTORY AGREEMENT—BONDS AND MORTGAGES—COMPENSATION.

The measure of compensation under said agreement is the amount of bonds called for therein, and the lien is according to the order specified in such agreement.

4. EXECUTORY AGREEMENT—LIEN.

Every express executory agreement in writing whereby the contracting party indicates an intention to make some particular property, real or personal, or a fund therein identified, a security for a debt or other obligation, or whereby he promises to convey, assign, or transfer the property as security, creates an equitable lien upon the property which is enforceable against the property.

5. EXECUTORY AGREEMENT—GARNISHMENT.

An attachment against the estate of the C. I. Co. summons M., president of the S. V. R'd Co., garnishee, to answer what property of the C. I. Co. he has in hand, and a judgment is rendered that the plaintiff recover of M., president of the S. V. R'd Co., garnishee of C. I. Co., a sum of money, are not an attachment and judgment against the S. V. R'd Co. as garnishee, and do not bind property in the hands of the latter company belonging to the C. I. Co.; and a sale of the property under execution upon such judgment does not pass title thereto, or bar the C. I. Co. from setting up its claim to such property against the S. V. R'd Co., either according to the general law, or law of Pennsylvania.

6. EXECUTORY AGREEMENT—BONDS AND MORTGAGES.

Such property being negotiable mortgage bonds, and it not appearing that when judgment was rendered they had been so executed as to be considered in existence as valid mortgage bonds, a sale of them under such proceeding would not pass title thereto under the Pennsylvania law.

*McDonald & Moore* and *F. Beckwith* for appellant.

*W. H. Travers* for Shenandoah Valley Railroad Co., *F. P. Clark, S. Dickinson* and *G. Caldwell* for the Fidelity Ins., Trust & Safe-Deposit Co., *C. L. Lamberton* for First Mortgage Bondholders.

BRANNON, JUDGE:

These suits have been in this Court on appeals heretofore, and reports of decisions on such appeals will be found in 28 W. Va. 623, and 32 W. Va. 244 (9 S. E. Rep. 180) to which,

particularly the latter, reference is made for the character and facts of the causes, so far as they are not given herein. When the causes went back to the Circuit Court of Jefferson county, a reference was made touching the claim of the Central Improvement Company; and the commissioner was directed to hear any testimony offered for or against that claim, and to report. The commissioner's report found in favor of the Central Improvement Company against the Shenandoah Valley Railroad Company on account of its claim based on second mortgage bonds, $250,000.00, with interest from April 1, 1879, to October 1, 1884, and on account of its claim based on income bonds, $379,224.00, with interest from April 1, 1879, to October 1, 1889, both aggregating $1,025,635.12, and from that sum, made up in common from the claims based on both classes of bonds, he deducted $11,000.00 for the amount of a sale made under an attachment of B. K. Jamison & Co. against the Central Improvement Company of certain bonds, as hereinafter stated, with interest from October 1879, to October 1, 1889, aggregating $17,600.00. The report gave the demand of the Central Improvement Company priority over all of the mortgages made by the Shenandoah Valley Railroad Company to the Fidelity Insurance, Trust & Safe-Deposit Company, trustee for bondholders. Exceptions were taken by the Fidelity Company, in effect, because of the amount found in favor of the Central Improvement Company, and because any amount was found for it, and because the report gave the Central Improvement Company preference over its mortgages, and other causes. The Shenandoah Valley Railroad Company excepted because any amount whatever was found against it in favor of the Central Improvement Company, and because it did not report certain attachment suits pending in Philadelphia against the Central Improvement Company as pending, and the priorities and amounts thereof, should there be recoveries therein. The court, on the hearing, held and decreed that the Central Improvement Company was entitled to $127,000.-00 without interest until the decree, and refusing its costs, and declaring its claim a lien on the railroad property in preference to the mortgages of the Fidelity Company, and all other demands. From this decree of December 3, 1889,

Crumlish's administrator has appealed to this Court. Said administrator, the Shenandoah Valley Railroad Company, and the Fidelity Company all complain of said decree, and specify errors therein. Crumlish's administrator, representing stockholders of the Central Improvement Company, complains because the decree allows only $127,000.00 for its demand, and refuses interest for time prior to date of the decree, and because it refuses costs.

On April 29, 1878, an agreement was made between the Shenandoah Valley Railroad Company and the Central Improvement Company reciting that, under contract theretofore made between said railroad company and said improvement company, the improvement company had agreed to build the road from Shepherdstown to the Chesapeake & Ohio Railroad, near Staunton—133 miles—and had done a large amount of grading and masonry on the first seventy five miles south of Shepherdstown, and, by reason of the financial panic of 1873, work had ceased up to the date of the agreement, and that it was the desire of both parties to the agreement that the bonds which had been paid to the Central Improvement Company, and by it pledged to other parties, be retired and canceled, in order that a new contract between John Satterlee & Co. and Alfred Creveling and the Shenandoah Valley Railroad Company might be carried out for the completion of the road to the Chesapeake & Ohio Railroad; and, in order that the Central Improvement Company be released from all liability under its contracts to build the railroad, it was provided, *first,* that the securities deposited with the Pennsylvania Railroad Company for advances by it to the Central Improvement Company should be surrendered by the Pennsylvania Railroad Company, it agreeing to receive in exchange therefor $250,000.00 of an issue of $500,-000.00 six per cent. currency second mortgage bonds of the Shenandoah Valley Railroad Company, subject to a prior lien of $15,000.00 per mile of first mortgage six per cent. bonds, which second mortgage bonds the Shenandoah Valley Railroad Company agreed to deliver to the Pennsylvania Railroad Company; and it provided, *second,* that the Central Improvement Company should deliver to the Shenandoah Valley Railroad Company all its first mortgage bonds held

by the Central Improvement Company received by it for the work it had done; and it provided, *third*, that the Shenandoah Valley Railroad Company should issue and deliver to the Central Improvement Company $250,000.00 of the second mortgage bonds aforesaid, in full consideration for the delivery and cancellation of the securities aforesaid; and the agreement provided, *fourth*, that the Shenandoah Valley Railroad Company should issue and deliver to the Central Improvement Company, in payment for the amount received by it from subscribers to its capital stock, which had been expended in the work, the amount paid in on said stock, with interest, six per cent. currency income bonds of the Shenandoah Valley Railroad Company, said bonds to be taken at fifty cents on the dollar, to be subject only to the first and second mortgage bonds therein mentioned; and the agreement, *fifth*, released the Central Improvement Company from damages for breach of its contracts for construction of the railroad. See this agreement, 32 W. Va. 253 (9 S. E. Rep. 183). Under this agreement, the vice-president of the Shenandoah Valley Railroad Company, and the trustee under a mortgage made by said company dated October 15, 1872, cancelled $531,000.00 first mortgage bonds which were still held and owned by the Central Improvement Company; and the trustee made a release of that mortgage. Afterwards the administrator of Crumlish brought a chancery suit, Crumlish having been a stockholder in the Central Improvement Company, in behalf of his estate and other stockholders, to realize the assets of said company to pay its debts and distribute the residue among stockholders, and particularly to declare the cancellation of said bonds invalid as made by said railroad company and trustee without lawful authority, and to hold said release void, and set up its claim to said canceled bonds, and their amount enforced as under said first mortgage. It afterwards filed an amended bill, alleging that the Shenandoah Valley Railroad Company claimed that its right to said $531,000.00 first mortgage bonds had been released and discharged by the said agreement of April 29, 1878, and attacking that agreement as invalid, and as offering no impediment to its claim to have restored to it said canceled bonds, and their enforcement under said mortgage of October 15, 1872.

The Circuit Court decreed the agreement of April 29, 1878, void, and decreed that the Central Improvement Company was entitled to the $531,000.00 first mortgage bonds, and that the mortgage of October 15, 1872, remained unreleased. The receiver of the Central Improvement Company and Crumlish's administrator thereupon filed petitions in a suit pending in the Circuit Court of Jefferson County brought by the Fidelity Insurance, Trust & Safe-Deposit Company against the Shenandoah Valley Railroad Company to foreclose mortgages, setting up the same claim in said petition as had been made in the suit of Crumlish, and alleging the said decree in its favor—in short, to participate in the proceeds of any sale of the railroad under decreee, and realize its $531,000.00 first mortgage bonds; and upon such petitions a decree of the same import was rendered as in the Crumlish suit, allowing the Central Improvement Company its original claim for mortgage bonds, declaring said agreement and release of the first mortgage invalid.

An appeal was taken to this Court; and on February 25, 1889, this Court decided that appeal, holding that the agreement of April 29, 1878, was valid and binding on the Shenandoah Valley Railroad Company and the Central Improvement Company, and the release made by the trustee of the first mortgage, dated October 15, 1872, was valid, and that under the contract of April 29, 1878, on the cancellation of the $531,000.00 first mortgage bonds held by the Central Improvement Company, that company became at once entitled to the $250,000.00 second mortgage bonds, and the income bonds, as provided for in said agreement. (9 S. E. Rep. 180.) That agreement being executory, and said bonds not having been delivered under it, a question arose in this Court whether, as the said railroad company had subsequently made three mortgages to the Fidelity Insurance, Trust & Safe-Deposit Company, to secure large amounts of bonds, the said railroad company had disabled itself to perform said agreement; and that question turned upon whether or not the said Fidelity Insurance, Trust & Safe-Deposit Company had notice of the rights of the Central Improvement Company under said agreement when said mortgages were executed. This Court held that, as the said

mortgagee trustee had constructive notice of said agreement, said mortgages, and the rights of bondholders under them, were subject to the rights of the Central Improvement Company under that agreement; and for that reason the Shenandoah Valley Railroad Company had not disabled itself from a specific performance of that agreement. The right of the Central Improvment Company under said agreement was called in the opinion then delivered an "equitable lien." That opinion did not find the amount of said claim, or specify the specific form of relief, as will be seen from the following quotation from that opinion prepared by President SNYDER: "I think it better to abstain at this time from indicating the manner in which this equitable lien of the improvement company ought to be enforced, or the specific form of the relief to be granted in that behalf, under the peculiar circumstances of this cause, for the reason that none of these matters were considered or passed upon by the Circuit Court. * * * From what has already been said, and from the facts appearing in the record, it is not apprehended there can be any serious difficulty in settling these questions." When the cause went back to the Circuit Court there sprung up several points of controversy—one of them as to the form of relief to be given the improvement company, and, if given by way, not of specific performance of the agreement, but by compensation in money, then as to the amount to be decreed for its equitable lien. This Court, while it did not indicate the form or measure of such relief, did say that a judgment for damages or breach of the agreement by the railroad company, in failing to deliver to the improvement company bonds as required by the agreement, would not satisfy the claim of the improvement company. This was so because of the large mortgages which would have preference over such judgment.

The judge of the Circuit Court filed a written opinion, in which he expressed the opinion that there was no proper process by which to measure the compensation to be given the improvement company save that which he adopted, and that was to take the amount ascertained as the amount of capital stock of the Central Improvement Company which

had been paid in, $138,000.00 and subtract from it $11,-000.00, the proceeds of a sale under the attachment of Jamison & Co. in Philadelphia, which went on a debt of the improvement company, leaving $127,000.00, and render a decree for that sum, refusing interest until the date of the decree, and refusing costs, and ignoring any right of the improvement company based on the clause of the agreement of April 29, 1878, giving it $250,000.00 in second mortgage bonds. So the Circuit Court by its decree gave for the claim of the Central Improvement Company $127,-000.00, with interest only from the date of the decree, as the full measure of the compensation to which that company was entitled under that agreement. I have carefully read the opinion of the circuit judge, and am compelled to conclude that the decree is erroneous. The circuit judge seems to have thought that as the assets of the Central Improvement Company belonged to the stockholders, and they would get any compensation which might be decreed, it only remained to ascertain their loss by the failure to deliver said bonds under said agreement, and that loss was measured by what they had paid in, seeming not to regard the fact that the improvement company owed large debts, whose owners would have right to have their debts paid out of the assets of the company preferably to stockholders, and that whether there were debts or not, or if there were none, the measure of the rights of stockholders was not what they had paid in ; for they would be entitled to what a distribution of the assets would give them, be it never so much larger than what they had paid in, as legitimate profits from the business of the corporation. When we look to the agreement of April 29, 1878, we find that two different classes of bonds, of different amounts, were to be delivered to the Central Improvement Company—$250,000.00 of second mortgage bonds, and another amount of income bonds ; the former in lieu of the securities to be surrendered by that company, and the latter as reimbursement for stock paid in. I do not perceive how, when the plain letter of the agreement called for two classes of bonds, each for a separate consideration, that call can be satisfied by giving compensation for failure to deliver one only, and utterly ignoring

the right to compensation for the other. To me it is plain that the compensation accorded the improvement company by this decree falls far short of that which the agreement contemplated; and, as to the refusal of interest anterior to the date of the decree, based on the theory that the improvement company was guilty of laches in failing to demand the bonds at the proper time, it is to be said that, the railroad company having obtained possesion of, and canceled, the $531,000.00 first mortgage bonds, it became its duty to tender in place of them, to the improvement company, second mortgage bonds. But I shall not further discuss this point, because this Court held that laches was not imputable to the improvement company. Hence it was error to deny such interest, and also costs.

Now, as to the manner or form of relief to be given the Central Improvement Company. This Court did not expressly decide that matter, as appears from the above quotation from the opinion. While that opinion plainly expressed the conclusion that the Shenandoah Valley Railroad Company had not, by the mortgages it executed, disabled itself from specific execution of the agreement of April 29, 1878, it did not say that literal performance of it should be decreed, but expressly waived any decision in that respect. If literal specific performance were decreed, requiring the issue of the bonds *nunc pro tunc*, so to speak, it might be a question what would be the *status* of such bonds. There already have been issued second mortgage bonds, and this Court has said that this claim is paramount to that mortgage. If the *status* of these bonds, as compared with those under mortgages already issued, should be questionable, that would be a sufficient reason against that form of relief, and they would be of doubtful, if not dangerous, standing in the stock market. All parties being before the Court, it may be said that those bonds could be decreed their preference over other bonds. The corporation is insolvent. Another circumstance is that the $250,000.00 bonds which the improvement company was to get were to stand on the same plane with a like amount to go to the Pennsylvania Railroad Company, and they have been merged into a subsequent mortgage. But if issued they would participate in the distribution of the

proceeds of sale of the railroad under decree of foreclosure, in a manner in no wise different from what would be the case were a plain money compensation given. Why go through the formality of the literal issue of such bonds and the execution of a mortgage for them? One of these suits has for its object to foreclose the mortgages and sell the railroad; and all ends will be better accomplished by decreeing, not literal specific execution, but a compensation in money, treating that as done which should have been done under the agreement—a course frequently resorted to by courts of equity. The agreement of April 29, 1878, is an equitable mortgage. It contains a distinct covenant on the part of the railroad company to issue and deliver to the improvement company second mortgage bonds and income bonds to be subject only to the first and second mortgage bonds in it mentioned. As the railroad company took possession of the first mortgage bonds of the improvement company and destroyed them, it was under duty to issue to the improvement company the bonds required by the agreement; and equity, treating that as done which the parties contracted to do, will hold the railroad company accountable as if it had been done, and treat the improvement company as if it yet held the bonds going to it under the agreement.

This Court held in *Wayt* v. *Carwithen*, 21 W. Va. 516, that "any deed or written contract used by the parties for the purpose of pledging real property, or some interest therein, as security for a debt or obligation, which is informal and insufficient as a common-law mortgage, but which by its terms shows that the parties intended that it should operate as a lien or charge upon specific property, will constitute an equitable mortgage, and may be enforced in a court of equity." Also *Knott* v. *Manufacturing Co.*, 30 W. Va. 790, (5 S. E. Rep. 266.) "An agreement to give a mortgage, not objectionable for want of consideration, is treated in equity as a mortgage. upon the principle that equity will treat that as done which by agreement is to be done. This doctrine has been asserted frequently both in this country and in England." 1 Jones, Mortg. § 163. "An agreement, on a sufficient consideration, to give a mortgage on specific property, creates an equitable lien upon such property which

takes precedence of the claims of the promisor's general credi-
tors, and of the claims of subsequent purchasers and in-
cumbrancers with notice of the lien." 1 Jones, Liens, § 77.
See opinion in *Ruffners* v. *Putney*, 12 Gratt. 551. "If the
transaction resolve itself into a security, whatever may be
its form, and whatever name the parties may choose to give
it, it is in equity a mortgage," says Judge STORY in *Flagg* v.
*Mann*, 2 Sum. 533. "The doctrine may be stated in its
most general form, that every express executory agreement
in writing, whereby the contracting party sufficiently indi-
cates an intention to make some particular property, real or
personal, or fund therein described or identified, a security
for a debt or other obligation, or whereby the party prom-
ises to convey or assign or transfer the property as security,
creates an equitable lien upon the property so indicated
which is enforceable against the property in the hands, not
only of the original contractor, but of his heirs, administra-
tors, executors, voluntary assignees, and purchasers or in-
cumbrancers with notice." 3 Pom. Eq. Jur. § 1235; 1
Lomax Dig. 317; 2 Min. Inst. 296; 2 Bart. Ch. Pr. 1019.
Of course this doctrine applies to railroads. Jones, Ry.
Secur. § 73. In *Miller* v. *Railroad Co.*, 36 Vt. 452, a railroad
company agreed to issue bonds and give a mortgage there-
for, and the instrument was signed in the name of the presi-
dent, and was not the deed of the company; and it was held
good as an equitable mortgage, and valid against subsequent
mortgagees with notice of it.

This Court called the right of the Central Improvement
Company in its former opinion an "equitable lien," and such
it is. Thus it is proper to decree, not specific performance,
but compensation in money. The question has been raised,
what sum shall be decreed? It is proposed that not the
full sums called for in the agreement shall be given, but that
a valuation be put on the bonds which it required to be
delivered upon some such process as that by which courts of
law ascertain damages for breach of contracts to sell and
deliver property. Different processes are proposed. These
bonds were never issued, never listed at the stock ex-
change; and we can not safely ascertain their market
value, for they had none. This being so, it is proposed that

we apply the process called *cy pres*, which is applied to charitable bequests, or an approach as nearly as possible to it. I fail to see the force of this proposition. One basis suggested is the price realized at a sheriff's sale in Philadelphia, under a legal proceeding of certain bonds issued by the Shenandoah Valley Railroad Company as the bonds going to the Central Improvement Company under said agreement. This sale was not the proper open market for such securities. The bonds sold were part of a second mortgage issued under a mortgage securing, not $500,000.00, as called for in the argreement, but $1,500,000.00. It seems that only $500,000.00 in bonds were issued; but the mortgage secured $1,500,000.00, and the indorsement on the bonds stated that they were parts of an issue of that amount, and the stockholders authorized that amount, and there might have been an additional issue under it. The Shenandoah Valley Railroad Company was not garnished as a formal party, but only Milnes, who was its president, and, when he answered, he answered that the bonds were in preparation; and it does not appear that they had been issued when judgment was rendered against the garnishee. These and other reasons place that sale under a cloud as a standard of value. The bonds brought only $11,000.00 for the $250,000.00, and there is evidence tending to show they were largely more valuable. Besides, the mortgage under which the bonds sold were issued made them subject to a mortgage of January 1, 1879, to the Farmer's Loan & Trust Company for $2,250,000.00, with 7 per cent. interest; a larger interest than that to which the bonds due to the improvement company under the agreement were subject.

As to the income-bonds, they had no market value, and they were certainly not lawfully issued at that time; and this sale would furnish no safe basis. (See, further, as to this sale, what is said below.) A sale of its right to $250,-000.00 second mortgage bonds for $25,000.00 to Boyce, vice-president of the Shenandoah Valley Railroad Company, by the Pennsylvania Railroad Company, can furnish no fair criterion of value. The Pennsylvania Railroad Company was fostering the new enterprise, the Shenandoah Valley Railroad, as an important

feeder to its system of business with the Virginias and the south, and had traffic arrangements with it, had advanced money to the improvement company to further its work, and, as the record fairly leads us to believe, was solicitous to aid its completion, and was selling, as it supposed and likely was, for the benefit of the new project, to facilitate its release from embarrassment, or to further new contracts for completion. It was a private sale, not in the proper market for such securities, and at best is only a circumstance tending to show the value.

As to the sale made by Jamison & Co. to Clark & Co., by agreement, July 12, 1879, for $25,168.85, the amount of the judgment of Jamison & Co. against the Central Improvement Company. It was a sale of such right as would be acquired under the sheriff's sale, under the attachment in Philadelphia, as the agreement provided that Jamison & Co. should buy the bonds under that sale, if they should not go at a price above their judgment, and turn them over to E. W. Clark & Co. This was a private sale. It was a sale of such right as the sheriff's sale would confer, with the clouds and questions over it, as above stated, with the additional and strong reason against this, as a test, that Jamison & Co. only aimed to realize their debt. That attained, they were satisfied. A private sale, influenced by private considerations. The evidence of Kelly, a banker, shows that such second mortgage bonds as those called for by the contract would have been worth at least par in 1883. First mortgage bonds then for the first time came on the market, and commanded from $110.00 to $114.00.

But, in my opinion, all these suggested processes or standards for the ascertainment of value are, if not irrelevant, inapplicable to this case; and I refer to them only in deference to the fact that they are presented for our consideration by counsel. If a party covenant to deliver another's stock or bonds, in an action for failure to do so, we would apply some principle to assess the damage. The general rule would seem to be the value at the time of the breach of the contract. 2 Suth. Dam. 382. The Court of Appeals of Virginia in *Enders* v. *Board*, 1 Gratt. 372, held that, where a person agreed to return stocks borrowed, the measure of

damages was the value of the stocks when they should have been delivered, with interest, and that there was no difference in this respect between stocks and other property. But this is not a contract by the Shenandoah Valley Railroad Company to deliver stock of another corporation, but its own bonds promising to pay a debt which by the bonds it would acknowledge itself bound for. Why, in such case, seek any theory or basis of valuation for the bonds, as if they were commodities? Property or commodities they would be for certain purposes, but not here, as between the railroad company, debtor, and the improvement company, creditor, in the ascertainment of a debt. For this purpose they are to be regarded as calling for the payment of sums certain. As well might we enter upon a *cy pres* or approximating process in case one man, for a consideration, agrees to execute another his bond, and give a mortgage therefor. Would not a court of equity treat the demand of the party as for the certain number of dollars, as if the bond had been in fact executed? What more simple and reasonable than to say that the railroad company, by the agreement, acknowledged itself to owe the improvement company $250,000.00 payable in its own bonds, and that the bonds themselves, if delivered, would have *per se* imported a debt of a certain number of dollars? The agreement shows that for the surrender of the $531,000.00 bonds the railroad company acknowledged a liability of $250,000.00 payable in its own bonds; and why it is not liable in just that sum, I am unable to see. On the bonds, had they been delivered, an action of debt could be maintained, as the bonds are the principal debt, the mortgage only security for it. Jones, Ry. Secur. § 400; Jones Mortg. § 1215; *Camden* v. *Alkire*, 24 W. Va. 674, point 6, and citations. Equity regards that as done which ought to have been done. Certainly, this is just, as between the railroad company and the improvement company; it being the letter of the agreement, and it requiring the railroad company only to pay the amount which it agreed to pay. The improvement company has the same right to recover the sum called for in dollars as have the first mortgage bondholders. Is it fair to say that the railroad company can be allowed to say that it does not owe so many

dollars, in the face of the letter of its agreement, and ask us to walk paths which are uncertain, largely hypothetical, and out of the natural, plain route, to seek a process to reach a sum at best only approximate? Shall the railroad company have leave to cut down and depreciate the sum nominated in its own bond? If so, why may not any debtor do so? We think it does not lie with the debtor company to do this; and, if it can not complain of having the letter of its agreement made the measure of its liability, who can complain? Not the Fidelity Insurance, Trust & Safe-Deposit Company; for, if such be the right of the improvement company against the railroad company, that measure must stand valid against the Fidelity Company, as it had notice of the right of the improvement company, as this Court heretofore decided. We hold that for the second mortgage bonds the Central Improvemen Company is entitled to $250,000.00 with interest from the 1st day of April, 1879, subject to a credit on that claim of $11,000.00, proceeds of the sale in Philadelphia, and for income bonds, $379,224.00, without interest. The agreement provides for the delivery to the improvement company of income bonds, at fifty cents on the dollar, for the capital stock of the improvement company paid in and expended, with interest. The amount paid in was $138,000.00, which with interest from January 7, 1873, to April 1, 1879, amounts to the sum of $189,612.00, which, being doubled, forms the said sum of $379,224.00, for which sum income bonds were due the improvement company. But this bears no interest. That bond promises the payment of interest "only out of the income, rents, issues, and profits, semi-annually, on the first day of January and July in each year, if the income, rents, issues, and profits of the said company, in the several years during which this bond is running to maturity, enables it so to pay, after paying the necessary expenses of keeping in repair and operating the railroad of said company, and after paying the interest on all liabilities and obligations of the said Shenandoah Valley Railroad Com pany prior to the date hereof." It does not appear that there was income from the operation of the railroad to pay interest; and, its payment being conditional upon such

income, interest can not be paid. But I do not see that, merely because the improvement company claimed a larger amount, but was held bound to take a less, that should bar it from interest on its claim for second mortgage bonds. *Shipman* v. *Bailey,* 20 W. Va. 140.

I come now to a question which seems to have been greatly contested in the Circuit Court, and is so contested here, and without plausible ground, as it seems to me, in view of the opinion handed down February 25, 1889. This question is this: Is the lien of the Central Improvement Company, for the compensation it is entitled to, prior or subsequent to the first mortgage to the Fidelity Insurance, Trust & Safe Deposit Company? We answer that it is subsequent to that first mortgage, though that mortgage is subsequent in date— April 1, 1880—to the agreement of April 29, 1878, to the extent of $15,000.00 per mile, with interest at six per cent. In delivering the opinion of this Court, SNYDER, P., said: "I am therefore of opinion that the Fidelity Company is not a purchaser without notice as to the said equitable lien of the improvement company. Having reached this conclusion, it is apparent there is no foundation for the contention of the improvement company that the railroad company has disabled itself by subsequent mortgages from performing its part of the said agreement of April 29, 1878. All these mortgages are subordinate to the claim of the improvement company under said agreement; and said claim may be enforced, not only against the railroad company, but against those claiming under said mortgages." It is urged that this language subordinates the first mortgage of the Fidelity Company to the lien of the improvement company. It would be to no purpose to refer in lengthy detail to the elaborate and able arguments made to sustain this claim of priority for the improvement company. Language used in the Court's opinion to the effect that the mortgage trustee could only do what the mortgage authorized him to do, and that his release could not prejudice rights of bondholders whose bonds were unpaid, and that the Fidelity Company had notice of the rights of the improvement company, is referred to as countenancing the proposition that the first mortgage to J. Edgar Thomp-

son for bondholders, dated October 15, 1872, under which
the improvement company held the $531,000.00 bonds which
were canceled, was alive, and in force, and that the release
did not impair it; and, as the second mortgage bonds had
not been delivered to the improvement company under the
agreement, the lien of the improvement company for com-
pensation was prior to that of the first mortgage to the
Fidelity Company. President SNYDER used language here
referred to only in process of reasoning leading to the con-
clusion that the act of the trustee could not destroy rights
under the mortgage of 1872 yet unsatisfied, and that, as the
improvement company had right under the agreement of
April 9, 1878, to second mortgage bonds in place of the
bonds it held under the mortgage of 1872, the subsequent
mortgagee was a purchaser with notice of the right of the
improvement company under said agreement; and it is plain
from the whole opinion that the language referred to was
not used to maintain or indicate that a right, under the
agreement, to compensation took precedence as a lien over
the first mortgage of the Fidelity Company. The conclu-
sion that the Fidelity Company had notice of the rights of
the improvement company under the agreement and all its
mortgages were subject to that right, only meant that what-
ever was the right of the improvement company under the
agreement was to be preferred to the mortgages. Had it
been still owner of bonds under the mortgage of October 15,
1872, the mortgage would be still alive, and would give pri-
ority to the latter mortgage to the Fidelity Company; but,
the improvement company having by said agreement sur-
rendered its bonds under the mortgage of October 15, 1872,
and consented to take second mortgage bonds in place of
them, that agreement, not the mortgage of 1872, became
the touchstone of its rights; and the position as a lienor
given to the improvement company by that agreement is its
true position. The opinion of this Court did say: "All
these mortgages are subordinate to the claim of the improve-
ment company under said agreement; and said claim may be
enforced, not only against the railroad company, but
against those claiming under said mortgages." This
language is pressed in argument to establish for the im-

provement company priority in order as lienor over the Fidelity Company's first mortgage. It is not capable of such construction, taken either as an isolated passage, or in connection with other parts of the opinion. If it were to be rewritten, I do not see that its perspicuity or accuracy could be improved. It does not say, simply, that "all these mortgages are subordinate to the claims of the improvement company," but immediately adds the words "under said agreement," making the clause read : "All these mortgages are subordinate to the claim of the improvement company under said agreement." Then we appeal to that agreement to learn what is the claim and right under it vested in the improvement company. This Court held that its $531,000.00 of bonds under the mortgage of October 15, 1872, had been effectually canceled, and that in place of them the rights of the improvement company were reposed in the agreement of April 29, 1878, and that this agreement was valid as to both the railroad and improvement companies; and I can discover no appearance of reason to claim that, notwithstanding this, that mortgage still gives rank to the lien under a different instrument, when that instrument itself gives that lien a different rank. The bonds were canceled; and yet this equitable claim holds their place as a lien, when that equitable claim arises under the said agreement, which itself gives a place as a lien to the child of its creation.

The result of our former decision is that said agreement of April 29, 1878, is binding on railroad company, on improvement company, and on the Fidelity Company. It expreessly says that after the improvement company had failed to go on with the work of constructing the railroad, and it had long been suspended, both parties desired that the bonds held by the improvement company should be retired and canceled in order that a new contract between John Satterlee & Co. and Alfred Creveling and the railroad company might be carried out for the completion of the road ; and it provides in clause 1 that the securities deposited with the Pennsylvania Railroad Company for the amount advanced to the Central Improvent Company be surrendered by the Pennsylvania Railroad Company to the Shenandoah Valley Railroad

Company, the Pennsylvania Railroad Company agreeing to
receive in exchange therefor, under an agreement already
made between said companies, $250,000.00 of an issue of
$500,000.00 six per cent. currency second mortgage bonds of
the Shenandoah Valley Railroad Company, subject to a prior
lien of $15,000.00 per mile of first mortgage six per cent.
bonds, which second mortgage bonds the Shenandoah Val-
ley Railroad Company agreed to deliver to the Pennsylvania
Railroad Company; and it provides in clause 2 that the
Central Improvement Company should deliver to the Shen-
andoah Valley Railroad Company all the first mortgage
bonds of the Shenandoah Valley Railroad Company held by
it; and it provides in clause 3 that the Shenandoah Valley
Railroad Company should issue and deliver to the Central
Improvement Company $250,000.00 of the second mortgage
bonds aforesaid; and it provides in clause 4 that the Shen-
andoah Valley Railroad Company should issue and deliver
to the Central Improvement Company, in payment of stock
paid by the stockholders, certain improvement bonds, which
improvement bonds were to be subject only to the first and
second mortgage bonds in the agreement mentioned.

Here observe that the agreement refers to the new contract
for the completion of the road made by the Shenandoah Valley
Railroad Company with Satterlee & Co. and Creveling, and
makes concessions in order that it might be carried out; and
thus both parties know of and approve it, and desire it to be
carried out, and it becomes a part and parcel of the agree-
ment. What is that contract? It bears date April 3, 1878,
shortly before the agreement of April 29th, and provides
that John Satterlee & Co. and Alfred Creveling shall com-
plete the railroad and receive as payment certain stock and
"also first mortgage bonds to the amount of fourteen thousand
dollars per mile of completed road out of the total issue of
fifteen thousand dollars per mile." It provides, also, that
"one thousand dollars per mile of first mortgage bonds shall
be retained by the party of the first part for the exclusive
purpose of settling for the right of way, and for any claim
that may now be due against said railroad company." It
also recites that "the party of the first part agrees to issue
the first mortgage bonds to the fixed limit of fifteen thousand

dollars per mile for each mile of road built under the terms of this contract. Said party of the first part agrees * * * to remove, or cause to be removed and canceled, all liens, judgements, or demands that are now against, or may be against, said railroad, or any of its securities, and not to give any liens, mortgages, or other incumbrances that will in any way affect said railroad, or impair the value of its first mortgage bonds, limited to fifteen thousand dollars per mile of completed road." It contained also the clause: "The parties of the first part agree to furnish free of cost to the parties of the second part all the right of way, and to surrender all improvements now made in the line of the road, such as grading, masonry, and all work heretofore done on the line of the said railroad, free and unincumbered, to the parties of the second part." The improvement company had $531,000.00 first mortgage bonds on an incomplete railroad, and they were of little or no value, and it was subject to a claim for damages for breach of contract to build the road. Taking its agreement of April 29, 1878, in connection with the Satterlee contract, it is plain that the improvement company, to get some return for the work it had done and free itself from damages, agreed to the creation of a first mortgage bond, to be used in finishing the railroad, and that the railroad and the work of grading, masonry, and other work it had done on it, should be surrendered to that first mortgagee free of lien and incumbrance. How could it be free of incumbrance to the new first mortgagee, if yet the lien of the old mortgage of October 15, 1872, was to continue in force? The improvement company agreed to surrender for retirement and cancellation its first mortgage bonds and disencumber the railroad property, and create new first mortgage bonds to go to Satterlee & Co. and Creveling, and to take in lieu of its old first mortgage bonds second mortgage bonds, being half of an issue of $500,000.00 second mortgage bonds, which the agreement required to be issued, which necessarily took a rank second to the first mortgage bonds which the agreement itself recognized. The very term "second mortgage bonds" means bonds subject to first mortgage bonds. But what first mortgage bonds were meant in the agreement? Plainly,

those to be issued to go to Saterlee & Co. and Creveling, to finish the road. And this contract also provided for the removal of liens that prejudiced the first mortgage bonds to be issued under it, so that such bonds should not be incumbered by any prior liens. How could this be the case, if the old mortgage bonds of 1872 should continue, or the lien of said mortgage continue? The agreement provided that for its paid-in stock the improvement company should take income bonds "to be subject only to the first and second mortgage bonds herein mentioned." Plainly, the first mortgage bonds which were to be issued to Satterlee & Co. and Creveling, not those which were to be retired and cancelled, and the $500,000.00 second mortgage bonds that were to go to the Pennsylvania Railroad Company and the Central Improvement Company in place of those they surrendered, are here referred to. Thus, this agreement, which has been held binding on the improvement company, and which is the sole repository of that company's rights, subordinates in order, as a lien on that railroad property, the second mortgage and income bonds which the improvement company was to receive under that agreement, and concedes a preference to the first mortgage bonds therein contemplated. I do not see how we can say that the bonds held by the improvement company under the mortgage of October 15, 1872, were effectively canceled, and yet give the date of the lien of those bonds to second mortgage bonds not mentioned in that mortgage. It has bound itself to retire and cancel those bonds.

A theory proposed in behalf of the improvement company, based on a somewhat different line of argument from that resting on a misconstruction of the opinion of this Court, is that when the agreement of April 29, 1878, was made that company held said first mortgage bonds, and that agreement was executory, and said company bound itself to surrender such bonds only provided that the second mortgage bonds should be delivered to it, and that it can be deprived of its lien only in that way, and none other, in which it agreed to be deprived of it, and that no release can affect that lien until the compensation to be fixed under said agreement shall be paid it, inasmuch as no second mortgage bonds were de-

livered to it. But this Court has held that the bonds have been canceled, and that the release is operative except as to the right to compensation under said agreement, and that agreement itself makes the right to compensation to the improvement company second and subject to the first mortgage bonds to be issued after the date of said agreement pursuant to that agreement and the Satterlee & Co. and Creveling contract; and, though this argument treats the non-delivery of the bonds called for by the agreement as the act on which alone the lien of the mortgage of 1872 should cease, this Court treats the case as though that act had been done as it was agreed to be done.

Another contention presented in argument is that if the Shenandoah Valley Railroad Company had complied with said agreement when it should have done so, when it canceled the first mortgage bonds held by the improvement company —say April 1, 1879—and delivered the bonds it had stipulated to deliver, they could have been sold years ago, at, or nearly at, par, and that the improvement company is entitled to the highest market price which could have been realized between that date and the decree in the cause, and that the improvement company has been thus damaged, and is entitled to damages on that score, and that, as the railroad company so failed to deliver when it should have delivered the bonds, whereby the improvement company lost the highest market price, a court of equity should accord to the compensation it is to receive a priority over the Fidelity Company mortgage, and not give it a second place, whereby it may realize much less for its bonds than it would have realized from a sale in the market. Now, an answer to this theory which at once prominently presents itself is that until since the decision of this Court in February, 1889, that company repudiated, antagonized as not binding on it, the agreement of April 29, 1878, and claimed the full amount of $531,000.00 first mortgage bonds; and, so far as its conduct shows, it would not have received the bonds under said agreement had they been tendered.

The decree of the Circuit Court is erroneous in giving the compensation decreed to the Central Improvement Company preference and priority as a lien on the railroad property over

the bonds secured by the mortgage dated April 1, 1880, from the Shenandoah Valley Railroad Company to the Fidelity Insurance, Trust & Safe-Deposit Company. The bonds secured by that mortgage, to the extent of $15,000.00 per mile of railroad, with interest on such bonds at the rate of six— not seven—per cent. per annum, have preference as a lien over the amount due as compensation to the said improvement company under said agreement of April 29, 1878.

It is contended by the Shenandoah Valley Railroad Company and the Fidelity Company that all right of the Central Improvement Company to equitable compensation has been extinguished by an attachment proceeding in Philadelphia at the suit of B. K. Jamison & Co. against Milnes. Jamison & Co. had recovered judgment against the Central Improvement Company for $25,168.85 on July 10, 1877. On July 5, 1879, an attachment issued for the amount of said judgment; and it commanded that "William Milnes, president Shenandoah Valley Railroad Company, garnishee," be summoned to show cause why said judgment should not be levied on the effects of the Central Improvement Company in the hands of the garnishee. On July 25, 1879, Milnes, for himself, and as president of the Shenandoah Valley Railroad Company, filed answers to interrogatories as to effects of the improvement company or railroad company in his hands, stating : "I have $250,000.00 of the second mortgage bonds of the Shenandoah Valley Railroad Company now in course of preparation. Also, income bonds of said railroad now in course of preparation, to an amount not less than $178,000.00. I hold these securities as the property of the Central Improvement Company or their assigns. I hold these securities as president of the Shenandoah Valley Railroad Company. I hold nothing individually." On September 11, 1879, a rule issued against the garnishee to show cause why judgment should not be entered against him upon his answers, which was served on Milnes September 12, 1879, and on McKeehan, secretary of Central Improvement Company, 13th September 1879. On September 15, 1879, judgment was entered that "plaintiff recover of William Milnes, Jr., president of the Shenandoah Valley Railroad Company, garnishee of the Central Improvement Company," certain sums. On September 18,

1879, a writ issued commanding the sheriff to make of the property of Central Improvement Company "in the hands and possesion of William Milnes, Jr., president of the Shenandoah Valley Railroad Company, garnishee," certain sums in favor of Jamison & Co., for non-payments of a certain judgment obtained against said garnishee. This writ was levied September 18, 1879, on 250 second mortgage bonds of the Shenandoah Valley Railroad Company, of the par value of $1,000.00; also, 178 income bonds of same company, of par value of $1,000.00. They were sold by the sheriff for $11,000.00 on October 13, 1879. The bonds thus sold were part of an issue of $1,500,-000.00 second mortgage bonds, whereas the agreement of April 29, 1878, gave the improvement company half of an issue of only $500,000.00. It is said only $500,000.00 second mortgage bonds were actually issued under order of directors; but the mortgage secured $1,500,000.00, and the bonds recite that they belong to a series of $1,500,000.00 and a further issue might take place. This would, or might, greatly depreciate the bond. The agreement called for an issue limited to $500,000.00, not $1,500,000.00. The income bonds to be issued under the agreement were by it "to be subject only to the first and second mortgage bonds herein mentioned." The income bonds sold were not secured by mortgage. I think they were a part of a series of $400,000.00, whereas the improvement company's income bonds were less in aggregate, and had place next to the first and second mortgage bonds. The bonds, both mortgage and income, which were to go to the improvement company, were to be subject to first mortgage bonds bearing six per cent. interest, whereas those mortgage bonds were made subject to bonds bearing seven per cent. interest, payable in gold, secured by mortgage to Farmer's Loan & Trust Company dated January 1, 1879, thus being subject to larger priority than the agreement allowed. Again, this attachment was against "William Milnes, Jr., president Shenandoah Valley Railroad Company garnishee," not against the company. Those words described him as president, and are merely *discriptio personœ*. *Rand* v. *Hale*, 3 W. Va. 495; *Bank* v. *County of Lewis*, 28 W. Va. 273, 292; *Early* v. *Wilkinson*, 9 Gratt. 71; 3 Rob. Pr. (New)

64. The Shenandoah Valley Railroad Company, though it was the debtor and custodian, and under legal obligation to deliver them, was not as a corporation a party or garnishee. The judgment on the attachment was, for similar reasons, not a judgment against the company, but personal against Milnes. As to the execution under which the levy and sale were made, it seems to me to stand on the judgment rendered on the attachment against Milnes, garnishee; not on that rendered in 1877, against the Central Improvement Company. There was no order of the court to sell these bonds under the attachment. In *King* v. *Hyatt*, 41 Pa. St. 229, the opinion says: "The judgment in this case might have been more simple, to wit, for the amount due to plaintiff and costs (stating the amount) to be levied on the bonds of the city of Erie belonging to the defendant Barr in the hands of the garnishee." In this judgment there was no such direction. Now, we may say that under the attachment, if the proper custodian, the Shenandoah Valley Railroad Company, had been the garnishee, these negotiable bonds themselves, from their negotiable character and currency, might have been subjected, or that an ordinary execution on the original judgment against the improvement company might have been levied upon them. *King* v. *Hyatt, supra.* But this judgment was not against the Shenandoah Valley Railroad Company, but against Milnes; and the execution was on that judgment, not the former. For the reason that this is no judgment against the Shenandoah Valley Railroad Company, it would not estop the improvement company from setting up the demand against said railroad company; and, even if the railroad company had been properly made garnishee, the judgment against it as garnishee would not estop the improvement company from setting up the demand against the railroad company as a mere matter of estoppel or preclusion by judgment, as is conceded in this case, under the decision of the supreme court of Pennsylvania in *Ruff* v. *Ruff*, 85 Pa. St. 333. But notwithstanding this, still, if the proceeding, judgment and execution had been against the Shenandoah Valley Railroad Company as garnishee, and not against a person described as its president, the title to the negotiabls bonds might have passed by sale under it,

But there is further reason against the effect attributed to said proceeding. When Milnes answered, July 25, 1879, the bonds were in course of preparation, as he said; but the resolution of the directors authorizing their issue was not passed until August 4, 1879, and that authorizing income bonds on September 29, 1879. The judgment against garnishee was September 15, 1879. The mortgage under which these bonds issued, though it bears date July 1, 1871, was not, it is conceded, and it is shown on its face, executed until after August 4, 1879; for it says it is subject to mortgage of January 1, 1879, to Farmers' Loan & Trust Company, and it recites a resolution of directors to issue the bonds passed August 4, 1879. The mortgage was acknowledged October 1, 1879; recorded, October 6, 1879. There might have been mortgage bonds in form, or papers in their form, though unsecured by mortgage actually executed, prior to the acknowledgment and recordation of this mortgage. From the sheriff's levy it would appear there were bonds. But his receipt for the bonds to Milnes is dated October 11, 1879, thus somewhat rendering it doubtful whether they were then in existence, fully executed. And the mortgage, on its face, shows a resolution of the stockholders as follows: "Resolved, that the following certificate be placed upon each of said gold bonds for the signature of the trustee or trustees, viz." (Here follows certificate.) And the draft of bond incorporated in the mortgage says: "This bond shall not become obligatory until the certificate hereon is duly signed by said trustee." Now, W. H. Travers, the trustee, did not accept the trust until September 20, 1879. Could there be any legal bond till then? Can we, at least, say there were in fact any bonds at the date of the levy of the attachment or of the judgment against Milnes, or at date of sheriff's levy? Those who would avail themselves of this proceeding should, under these circumstances, show that the proceeding is operative upon these bonds. There is no evidence to show that these second mortgage bonds were in existence when the judgment was rendered against the garnishee. As no resolution of directors to issue income bonds was passed until September 29, 1879, they were not legally in existence at the date of judgment or levy of execu-

tion on them.  There can be no pretense to say that the proceedings passed title to the income bonds.  Certainly, it is clear that the bonds sold were merely in preparation on July 25, 1879, when the garnishee's answers were filed, though until August 4th the directors had not authorized their issue.

It is claimed that, under the Pennsylvania statute, property not in the garnishee's hands when he is summoned, but coming to him before judgment, is liable to the attachment.  *Silverwood* v. *Bellas*, 8 Watts, 420, is cited for this position.  It was a case where after garnishment the garnishee received money of the debtor to send to him.  The Court says this became a debt due from him, and held it bound by the attachment.  But in the later case of *Railroad Co.* v. *Pennock*, 51 Pa. St. 244, it is held that "goods coming into the hands of the garnishee after the service of the attachment are not bound by it."  The opinion explicitly draws a distinction between "attachments of debts, and the like, or money passing through the hands of the garnishee," and goods, and says that in the former case money coming into the garnishee's hands after service of attachment would be bound, while goods would not be.  These bonds were seized and sold as goods and chattels.  So that proceeding does not bar the right of the improvement company.

I do not regard it necessary to say much as to the contention that there is an equitable estoppel against the demand of the Central Improvement Company arising out of the said attachment proceeding on the theory that a rule to show cause why a judgment against the garnishee was served on the secretary of the improvement company, and the company stood by, and allowed the bonds to be turned over to the sheriff and sold, without resisting.  It is not perceived how a compulsory proceeding *in invitum,* and under the circumstances stated above, could be construed as done with the consent of the defendant.  The improvement company entered no appearance, it is true, but gave no show of consent; and its mere inaction could not constitute such estoppel.

As to the matter of pleading, the Circuit Court did not require the improvement company to file pleading to assert its

right under the ageeement of April 29, 1879. I think this not absolutely necessary. The Fidelity Company's suit was to sell the property. The Central Improvement Company's receiver had filed a petition to set up its rights, and brought before the court the agreement; and there was a reference to take evidence as to its claim. It was so far a suit to convene lienors. All matters touching this claim could be, and were, informally presented; and by those who were not merely thus informal, but who were formal, parties; and there was no reason for delay in filing formal pleading to present matters already in the suits, and which could be fully heard. I see no reason why the improvement company should not be allowed its costs.

Net earnings while a railroad is in the hands of a receiver appointed by the court may be applied to the payment of claims having superior equities to that of bond-holders. These claims are confined to outstanding debts for labor, supplies, equipments, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. *Fosdick* v. *Schall*, 99 U. S. 235; *Addison* v. *Lewis*, 75 Va. 701. Under certain circumstances, and for proper purposes, receiver's certificates may be accorded priority over debts secured by mortgage. Jones Ry. Secur. § 542; Beach Rec. §. 379 *et seq.; Wallace* v. *Loomis*, 97 U. S. 146; *Union Trust Co.* v. *Illinois M. Ry. Co.*, 117 U. S. 434; 6 Sup. Ct. Rep. 809; *Miltenburger* v. *Railroad Co.*, 106 U. S. 286, 1 Sup. Ct. Rep. 140.

In any decree hereafter entered in these causes, it must be provided that the charges and liens on the railroad franchise and property stand, and out of its sale shall be paid as follows: (1) The proper costs of plaintiff in these causes; (2) proper receiver's certificates, or charges under the receivership; (3) the first mortgage bonds, with interest thereon at six per cent. per annum, to the extent of $15,000.00 per mile of the railroad, which bonds are secured by the mortgage dated April 1, 1880, given by the Shenandoah Valley Railroad Company to the Fidelity Insurance, Trust & Safe Deposit Company, deducting such interest as may have been paid on the said bonds; (4) to the Central Im-

provement Company, $250,000.00, with interest from April 1, 1879, subject to a credit of $11,000.00 as of October 11, 1879, for its claim for compensation for that amount of second mortgage bonds under the agreement of April 29, 1878; (5) to the Central Improvement Company the further sum of $379,224.00, without interest, for its claim for compensation for income bonds under said agreement, with interest from this date; (6) one per cent. interest on the first mortgage bonds secured by said mortgage dated April 1, 1880, to said Fidelity Insurance, Trust & Safe-deposit Company, to make up the seven per cent. interest called for by said bonds; (7) the bonds secured by the general mortgage dated April 5, 1881, given by said Shenandoah Valley Railroad Company to said Fidelity Insurance, Trust & Safe-Deposit Company; (8) the bonds secured by the income mortgage dated February 12, 1883, given by said Shenandoah Valley Railroad Company to said Fidelity Insurance, Trust and Safe-Deposit Company; and (9) such receivers certificates as can not be paid under the second class above specified.

For these reasons the decree of the Circuit Court of Jefferson County in these causes is reversed, with costs to appellant, and the causes remanded to that court for further proceedings therein according to the principles announced and directions given in this opinion.

REVERSED. REMANDED.