# CHARLESTON.

CRUMLISH'S ADM'R *v.* SHENANDOAH VAL. R. CO. *et al.*

FIDELITY INSURANCE, TRUST & SAFE DEPOSIT CO. *v.* SAME.

Submitted September 7, 1894—Decided April 17, 1895.

| | |
|---|---|
| 40 | 627 |
| 41 | 571 |
| 40 | 627 |
| 44 | 160 |
| 44 | 161 |
| 45 | 569 |
| 45 | 672 |
| 45 | 673 |
| 40 | 627 |
| d46 | 434 |
| 40 | 627 |
| 47 | 29 |
| 40 | 627 |
| 56 | 425 |
| 40 | 627 |
| f58 | 246 |

1. ADMINISTRATOR—EXECUTOR.
    An executor or administrator can not sue or be sued out of the state conferring his authority.

2. ADMINISTRATOR—FOREIGN ADMINISTRATOR.
    After a foreign administrator has come into a cause by petition to assert a demand of his decedent, the domestic administrator comes by petition to assert the same demand in his name. It is proper to recognize the latter as the proper party to represent the estate, and he takes the place of the foreign administrator. In such cases, orders or decrees rendered before the domestic administrator became a party do not bind him.

3. CHANCERY PRATICE—PETITION—REHEARING.
    A person who comes for the first time into a pending cause by petition, and is a proper person to file such petition, may have prior erroneous orders in the cause reheard and corrected, upon prayer for that purpose in his petition, whether the case be proper for a petition for rehearing or bill of review in the case of a party to a cause.

4. JOINT STOCK COMPANIES — STOCKHOLDERS — STOCK CERTIFICATE.
    One who subscribes and pays for stock in a joint-stock company is a stockholder, though he have no certificate of stock.

5. *Res Adjudicata.*
    In a suit involving, among other things, a debt between two corporations, a decree is rendered for a certain sum in favor of the one against the other, ascertaining the amount of the liability on the basis of the amount of paid-up stock of the creditor company. That decree is *res judicata* and estoppel between the companies as to the amount of recovery, and also as between the creditor company and its stockholders, and also between such stockholders as regards the amount of the recovery, but not as to the amount of paid-up stock in settling the rights of stockholders in the distribution of the fund arising from the debt so recovered.

6. RECEIVER—COMMISSIONS—COMPENSATION.
    There is no fixed rule in this state as to the mode of allowing

compensation to a special receiver, whether by way of commission or a fixed sum. Usually, when the fund is large, a lump sum is proper. The amount and mode of allowance are within the sound discretion of the court, under the circumstances of the particular case, subject to review on appeal.

7. RECEIVER.
Where a decree appointing a special receiver is reversed wholly, without any reservation, his office ceases with reversal.

8. RECEIVER—RECEIVER'S BOND
A receiver has no power or title until he give the bond required of him.

9. RECEIVER—COUNSEL FEES.
A special receiver may be allowed fair and reasonable fees paid to counsel necessary in the execution of his receivership. Courts ought to authorize employment of counsel where it is intended to give such power, and they are indisposed to allow such fees without previous authority to incur them given the receiver.

10. RECEIVER—COUNSEL FEES.
The amount of such counsel fees is within the sound discretion of the court, subject to review on appeal. Such fees are allowed to the receiver, not the counsel.

11. RECEIVER—EXPENSES
In the absence of authority previously given, expenditures to be allowed a special receiver must be reasonable, and such as are proper, essential, and necessary in the due and ordinary execution of his office, and such as were contemplated in his appointment and according to the nature of his business. In extraordinary cases, involving a large outlay of money, the receiver should always apply to the court in advance, for authority to make it.

12. JOINT STOCK COMPANIES—STOCKHOLDERS—DISTRIBUTION OF ASSETS.
Those claiming as stockholders the right to participate in the distribution of the assets in the winding up of the affairs of a private corporation must produce some satisfactory evidence of a present, subsisting interest.

13. CORPORATIONS—EXTRAORDINARY EXPENSES—BONDS.
A corporation has but one asset; namely, a decree for a certain sum against a railroad company, and a decree for the sale of its railroad, etc., to satisfy the same, after first satisfying prior liens and charges to a large amount. The creditors and owners of a greater part of the stock may, if they see fit, give to outside parties, out of the amount decreed to them, a bonus for a guaranty that at the commissioner's sale the railroad, *etc.*, shall be made to bring at least enough to pay their claim, as well as the prior liens and charges. And, if such bonus is made to appear to have been that without which neither creditors nor stockholders would have received anything, then the court

will charge the fund thus brought into the cause with the payment of such bonus, and, after the payment of the creditors, distribute the surplus, if any, among the stockholders according to their respective interests.

14. CONTINGENT FEES.

The payment of large contingent fees can not be provided for by the court, no matter how great and peculiar their merit may be. That, as far as lawful, must be left as a matter of express contract between client and attorney.

15. COMMISSIONER—COUNSEL FEES—TRUST FUNDS.

The practice of allowing to trustees, complainants and receivers, and their counsel, large and extravagant counsel fees and commissions, payable out of trust funds under the control of the court, commented on and disapproved.

W. M. STUART, JR., U. L. BOYCE and BARTON & BOYD for appellants.

HOLMES CONRAD, MARSHALL McCORMICK, D. B. LUCAS, FRANK P. CLARK and A. W. McDONALD for appellees.

W. M. STEWART cited 36 W. Va. 465; 85 Pa. 470; 29 Gratt. 763; 80 Va. 105; 27 W. Va. 1; 16 Md. 446; 11 S. E. Rep. 1063; 14 Gratt. 229; 14 Mass. 243; 17 Mass. 368; Well's Res Adjudicata 316; 33 Cal. 394; Cook's Stock & Stockholders, § 10; Gluck & Becker, Receivers of Corporations 36; High on Rec. § 121; 29 Gratt. 602; 21 W. Va. 124; Code, c. 133, s. 28.

R. T. BARTON cited 20 Am. & Eng. Enc. Law 111; L. R. 14 Eq. 322; Kerr on Rec. 221; 28 W. Va. 623; 33 W. Va. 761; 37 W. Va. 143, 486, 571; 35 W. Va. 518; 10 W. Va. 250; 131 U. S. 332; 33 W. Va. 152; 36 W. Va. 465; 33 W. Va. 158; 19 W. Va. 167; 16 Gratt. 116; 24 Gratt. 548; 22 Gratt. 769; Code, c. 129, s. 7; 2 Dan'l Ch. Pr. 1296; 80 Va. 191; 12 W. Va. 213; 9 W. Va. 434; 10 W. Va. 298; 20 W. Va. 244; 78 Va. 164.

MARSHALL McCORMICK cited 85 Va. 9; 131 U. S. 319; 135 U. S. 533; 32 W. Va. 244; 21 Gratt. 373; 76 Va. 160; 1 Bart. Ch. Pr. 492; 16 W. Va. 378; 93 U. S. 352; 113 U. S. 116; 27 Gratt. 928; 7 W. Va. 390; 75 Va. 508; 76 Va. 200; 1 Bart. Ch. Pr. 271; 2 Wall. 94; 95 U. S. 160; 31 Gratt. 550; 80 Va. 30.

HOLMES CONRAD cited 128 Mass. 194; 28 W. Va. 623; 32 W. Va. 244; 33 W. Va. 761, 775; 32 W. Va. 271.

D. B. LUCAS cited 36 W. Va. 465; 33 W. Va. 159; 26 W. Va. 710; 14 W. Va. 1; 21 W. Va. 698; Code, c. 54, s. 82, par. 2; 16 S. E. Rep. 564; 13 W. Va. 314; 10 W. Va. 250; 20 W. Va. 331; Id. 230; 25 W. Va. 692; 29 W. Va. 695; 26 W. Va. 583, 710; 22 W. Va. 509, 510; 101 U. S. 688; 26 Bar. 88; 16 S. E. Rep. 544; 35 W. Va. 103; 33 W. Va. 152; 135 U. S. 544; Herman, Estop. 165; 33 W. Va. 159, 761, 774; 36 W. Va. 465; 14 W. Va. 1; 21 W. Va. 698; 1 Greenl. Ev. § 558; 2 Dan'l Ch. Pr. 1321; 8 W. Va. 174; 10 W. Va. 298; 12 W. Va. 371; 27 W. Va. 387-92; 35 W. Va. 36, 39; Herm. Estop. §§ 1022, 1039, 800.

A. W. McDONALD cited 1 Smith Lead. Cas. 997; 19 Am. & Eng. Enc. Law 271; 33 W. Va. 761; High. Rec. § 806; 6 Paige 213; 20 Am. & Eng. Enc. Law 76.

For statement of facts see opinion of BRANNON, JUDGE, page 648.

HOLT, PRESIDENT:

In reviewing this case I have patiently followed the points involved down to minute details with an expenditure of time that would be manifest by giving such details, but that would encumber this opinon with a mass of statements and figures which could answer no useful end.

The conclusions reached are the following: *First.* The Jewett receipts for payment of one hundred shares of stock are already in the name of John P. Logan, by certificate No. 6, for one hundred shares, issued to him as assignee, on the 19th day of February, 1873. *Second.* There is a high degree of probability that the receipts of payment taken in the name of R. D. Barclay made for stock, say twenty thousand dollars by Col. Thomas A. Scott from 22d September, 1870, to 9th August, 1872, are not, and have not been since the 15th day of September, 1874, subsisting outstanding evidences of his ownership, legal or equitable, of that amount or any amount of the stock of the Central Improvement Company. At any rate, from some cause, whatever it may be, Col. Scott's estate is not made to appear now to be the owner of any stock in the Central Improvement Company. *Third.* The Central Improvement Company owed its creditors the

sum of three hundred and eighty one thousand nine hundred and ninety six dollars and seventy one cents. It had a decree against the Shenandoah Valley Railroad Company for seven hundred and ninety one thousand three hundred and thirty eight dollars, with interest from the 1st day of July, 1890, till paid—and it had nothing else; but there were liens and charges against the railroad, etc., of the railway company decreed to be sold, of higher dignity, and first to be paid, amounting to six million and six hundred thousand dollars. This was in the stringency of 1873, and, unless some one could be induced to bid something over the amount of this prior lien, then the Central Improvement Company would have of assets not one cent. All the creditors thought it wise and best to give parties who were able to buy a bonus of two hundred thousand dollars, afterwards reduced to one hundred and sixty thousand dollars, to make the property bring seven million and one hundred thousand dollars or over. One hundred and thirty four out of one hundred and thirty eight in value of the stockholders thought this the best—the only—thing to do, and did it in an informal way. The only one who complains is one stockholder, who has about one and thirty nine one-hundredths of the stock; say, four thousand one hundred dollars. He knew of the arrangement in its making and accomplishment, but stood by without assent or dissent. He also knew that his elsewise insolvent corporation was largely in debt. It was no error in the court, under such circumstances, to charge his stock with its proper proportional part of this item of expense.

I have no question but that the Jewett stock is already in and allowed to John P. Logan. Logan was not a subscriber; Jewett was, with receipts for his one hundred shares, containing the following: "This receipt to be surrendered upon receipt of stock." So that these receipts were evidence of the ownership of stock, and were used to transfer and pledge and deposit as collateral for loans, just as the certificates were. Jewett, about that time, and at the time of his death, in the early part of November, 1875, was hard pressed; "and at his death his estate was in a very complicated condition, and his securities were scattered 'everywhere, and it was

with great difficulty that we could ascertain really what he had. We had to go round personally to the different banks and places where his securities and papers were hypothecated to get any information about them at all." (Exhibit of William M. Stewart, Sr., one of his executors).

Logan gave a note for five thousand dollars for his purchase of stock. He found the note in bank indorsed by Judge Jewett, and, when he paid it, the money was put to Judge Jewett's credit, and the certificate of stock was issued to Logan himself, on the 19th day of February, 1873. The treasurer's memorandum on his books shows that receipts of payment of some one were used. Whose receipts of payment for the one hundred shares of stock were used if not those of Jewett? His receipts of payment were never taken up and money returned. There was only one hundred and thirty eight thousand dollars in all. One hundred and thirty four thousand dollars including the Logan five thousand dollars, are accounted for; and now to allow this to Jewett's estate runs the amount to one hundred and thirty nine thousand dollars, which can not well be so if the treasurer's official report of money paid in on stock, proved by his deposition in this case to be correct, is to be taken as true. It is no answer to say that in reaching this conclusion the court would be taking a mere conjecture, based on probability. Courts, in determining facts, act upon nothing else but probabilities of more or less cogency and convincing power. In fact, all human conduct and belief is based on probabilities. All that we have to see to is that we do not go by what is called "mere conjecture"—an inference based on presumptive evidence so slight, so non-exclusive of other reasonable modes of explanation, as to amount to a mere suspicion or surmise; a thing based on feeble or scanty evidence. There is nothing to contradict this but the fact that he once had receipts which can not now be found. This is because these executors have overlooked in the wrong place, and not in the right place, that is, among the file of receipts surrendered among the papers of the company, if such things were preserved. I will illustrate the distinction by the Scott claim of stock in

this case.  When I started to examine this record, and to read and re-read the evidence, and to scrutinize the transcript of the treasurer's book of issue of certificates of stock, my attention was arrested by the following, all on the one page (258) as follows:

Page 258.  No. 15.                    133 shares.
Issued to M. Baird.                   8—6, 1874..
Received certificates as above described.

                    M. Baird,
                    By M. Baird & Co., in liq.,
                    Per W. C. Stroud.

Transferred to No. 30, Canceled.      .
No. 16.                               267 shares.
Issued to Burnham, Parry, Williams & Co.

                                      8—6, 1874.

Received certificates as above described.

                    Void—Not issued, J. P. G.
No. 16.           ·                   267 shares.
Issued to Burnham, Parry, Williams & Co.

                                      8—16, 1874.

Received certificates above described.

                    Burnham, Parry, Williams & Co:
                    Per W. C. Stroud.

Here we have the receipts of payment of twenty thousand dollars for four hundred shares of stock presented by M. Baird and Burnham, Parry, Williams & Co., acting by one W. C. Stroud, neither of them apparently original subscribers, but M. Baird holding and presenting through Stroud such receipts to the amount of six thousand six hundred and fifty dollars, and Burnham, Parry, Williams & Co. holding and presenting such receipts to the amount of thirteen thousand three hundred and fifty dollars.  No original subscriber subscribed to either one of such amounts.

If we stop at this point, it would be a mere conjecture that these were the Scott receipts of payment of twenty thousand dollars for four hundred shares of stock, receipted for in the name of Barclay, the manager of his private business, and it remains conjecture by itself.  On the 13th day of April, 1874, and down to the 29th day of August, 1874, when he resigned,

R. D. Barclay was the president of the Central Improvement Company. In the suit in chancery, by bill for injunction of the County Court of Jefferson county, W. Va., against Thomas N. Ashley, secretary of the Shenandoah Valley Railroad Company, J. Edgar Thompson, trustee, Matthew Baird, Central Improvement Company, and the Shenandoah Railroad Company, the writ of summons was served on said Barclay, as president of said company, on the 13th day of April, 1874, in the city of Philadelphia, the place of his residence, and with it was an order of injunction restraining J. Edgar Thompson, trustee, also Matthew Baird, as well as William McClellan, the president of the Shenandoah Valley Railroad Company, from assigning certain mortgage bonds, but they were required to hold them subject to the further order of the court; also restraining Phillip Collins, proxy of the Central Improvement Company, and any and all other persons, from representing or claiming to represent the stock of the Central Improvement Company in the stockholders' meeting of the said Shenandoah Valley Railroad Company to be held on the 7th day of April, 1874. On the 13th day of April, 1874, notice was served on R. D. Barclay, the president of the Central Improvement Company, that on Tuesday the 21st day of April, 1874, at the hotel of D. Adams, in Luray, Page county, Va., and at other places, certain depositions would be taken. In that bill it was charged that Thomas A. Scott was the president of the Shenandoah Valley Railroad Company, and was also the owner in substance, if not in name, of forty thousand dollars in the stock of the Central Improvement Company; "that this stock now stands on the books of said company in the name of R. C. (D.) Barclay, the president of the said Central Improvement Company;" and that the contracts attacked between the railroad company and the improvement company were for that reason void. Barclay did not put in the answer of his Central Improvement Company as its president, as he was called on to do, but resigned the presidency on the 29th day of August, 1874, and Phillip Collins was elected as president in his place. Thomas A. Scott was still alive, for he did not die until 1881.

The new president, Phillip Collins, sought information and

knowledge on this vital point, so that he might make answer to this charge, and prepared and filed his answer, signed with his name, as president of the Central Improvement Company, to which he affixed its corporate seal, on the 15th day of September, 1874, accompanied by his affidavit, sworn to and subscribed on the 19th day of September, 1874, that the same was the seal of the Central Improvement Company, and the above attestation of the same was his signature; and his answer on that point is as follows: "It is admitted that the said Thomas A. Scott was president of said company (Shenandoah Valley Railroad Company) and Jonas W. Walker, vice president, when said contracts Nos. 2 and 3 were made; but it is not admitted, but denied, that said Scott was then, or ever has been a stockholder in the Central Improvement Company." It is still mere conjecture that W. C. Stroud presented these Scott receipts of payments on the 6th day of August, 1874, and obtained certificates Nos. 15 and 16; but it is certainly a circumstance in the case tending to show that the estate of Col. Scott does not now show itself to be the owner, legal or equitable, of four hundred shares of stock; and I use this only to show how readily they might pass into certificates issued in some other name. Are we to be told that Col. Scott at some time from the 29th day of August, 1874, to the 15th day of September, 1874, deliberately told Phillip Collins, president of the C. I. Co., that he was not a stockholder in the C. I. Co. when he was in fact the owner of four hundred shares? He knew it was the right of Collins to ascertain the truth, and make it known to the court, and it would take a good deal to convince me that Col. Scott misrepresented that fact to Collins, especially when the bill of injunction was served on the parties—on the 9th day of April on Collins, on the 7th of April on R. D. Barclay, on the 13th of April on U. L. Boyce, on A. K. McClure on the 7th of April, on Wm. McClellan on the 14th day of April, on Thomas N. Ashby on the 7th of April, on J. Edgar Thompson and Matthew Baird on the 13th day of April, 1874; and Collins' answer was completed and signed, sealed and attested, on the 19th September, 1874. That he did so is highly improbable. He had never accepted the four hundred shares. It

was put, from the start, in the name of his deservedly trusted agent, R. D. Barclay, for the use of the Penn. R. Co., or for some other person, or for whomsoever he might direct. So that he answered Collins truthfully that he never was the real owner. Mr. Barclay says that Col. Scott had full and complete access to these receipts of payment; that he would not have been obliged to call on him for this evidence of stock in order to deliver it to a purchaser. He had full access to it, and the right to do with it as he pleased. But Mr. Barclay, when questioned by McKeehan and the son and one of the executors of Scott, replied "that it had been so long ago that he had no recollection whether Col. Scott had any stock or not." When they asked Capt. J. H. Green, he said: "He didn't remember anything about it; it was so long ago." This was after the decree had been entered in this suit directing a commissioner to ascertain and report who were the owners of the Central Improvement Company's stocks, a suit which they both knew was pending. Mr. Barclay kept no accounts or memoranda of any kind, took no list, made no inventory of the securities he turned over *in solido* to the executors of Col. Scott in the summer of 1881. Now, after studying about it, he has the impression that these receipts were among the securities of Col. Scott which he turned over to his executors.

The evidence shows that these securities were kept together. They were in the aggregate of great value. Can any one convince us that they have not been carefully looked through again and again, or that it is any great task to search through them for an envelope carefully endorsed, "Central Improvement receipts;" for Mr. Barclay testifies that "he did not know how to 'keep books:' in the general acception of the term;" that "he had charge of Col. Scott's personal business, as distinguished from his official railroad business, from the 1st of November, 1862, until the time of his death, which occurred in May, 1881;" and that such a thing as keeping regular books for Mr. Scott was never done. "I never kept books like these or anything of the sort. When I got a receipt of that sort, I simply put it in an envelope, and on the back of it I put, 'Central Improvement Co. receipt,'

and put that, you understand, in the safe; and then I would get another one, and would put that in.    That is the way it was done."    This gentleman, who, from his whole testimony shows that he deserved the confidence for honesty and integrity which Col. Scott reposed in him, also shows us with complete frankness that his ten-years inference or conjecture that this envelope was there, to be turned over to the executors with the other securities of Col. Scott, can not override the inherent probabilities, and other well-known circumstances to the contrary surrounding the transaction.    In fact, it was only an impression of his, for he shows that ten years had caused his memory to grow dim.    They were carefully done up, marked and placed in a safe among other securities, and ones of great value, in May, June, July, and August, 1872. Why are they not found there in 1881?    There is but one probable answer.    They were taken out by Col. Scott or by his direction in 1874.    There is no need to hunt among the heaps of miscellaneous papers of Col. Scott stowed away, and out of the way, in trunks and boxes.    Col. Barclay never put them there, nor the executor.    They are what are called "securities" by these witnesses.    Among them they were placed, and among them they are not to be found.    If they are in the trunks and boxes, then the trunks and boxes are to be searched, and that confessedly has not been done.    There is a high degree of improbability that they are outstanding. Down to October 14, 1873, one thousand nine hundred shares had been evidenced by certificates issued.    Nine hundred were issued from August 29, 1874, when Capt. Green went out as treasurer, and Col. Barclay as president, down to the 21st day of February, 1880, when the three Collins certificates, of one hundred shares each (Nos. 38, 39 and 40) were issued, which were the last; making two thousand eight hundred in all, not including transfers and sub-divisions, which have to be included to bring the number up to three thousand seven hundred and fifty six, and the par value to one hundred and eighty seven thousand eight hundred dollars—a mode of counting which may mislead, and for our purpose can have no other effect.    No. 20, for one hundred and thirty four shares, to D. E. Small, per John H. Small; No. 21, for one hundred

and thirty three shares, to John H. Small; No. 22, for one hundred and thirty three shares, to administrator of Charles Billmeyer, deceased, per John H. Small—were all issued on the 15th day of December, 1876. These were issued when witness McKeehan was secretary and treasurer, and Phillip Collins was president. No money was then paid, for "they had paid their money, and had receipts for the money being paid; and, upon the direction of Capt. Green, I issued those certificates to them." (Deposition of C. W. McKeehan). Same witness says the three certificates, of one hundred shares each (Nos. 38, 39 and 40), issued to P. and S. Collins, per Phillip Collins, on February 21, 1880, were the original certificates issued to Mr. Collins. "I simply tore out from the back of the book blank certificates, and filled them up." No money was then paid. "Mr. Collins had given whatever consideration he gave for his stock long before that, but they had not been issued until that time; that is, the certificates had not been issued until that time." "I did it at the request of Mr. Collins. He was the president, and signed it, and I signed as secretary." "I don't remember what the original authority was on which to make the original issue of three hundred to Mr. Collins, but it was some writing from the Pennslyvania Railroad office. It was from Mr. Barclay or Mr. Green. There was abundant authority for issuing it, as I understood it." It appears to have been paid for in 1870, as shown by books of B. H. Jameson, treasurer. All this evidence before us, scrutinized in detail, and put together, points with a very high degree of probability to the fact that these receipts of payment made by Col. Scott are not outstanding. From some cause, whatever it may be, Col. Scott's estate is not made to appear now to be the owner, legal or equitable, of stock in the Central Improvement Company and, for the purpose in hand, that which does not appear does not exist.

### CHARLES McFADDEN'S CLAIM.

After the decree was entered directing Master Commissioner Brown to ascertain and report who were the holders of the Central Improvement Company stock, and to what extent,

McKeehan wrote him several letters, asking him if he had stock, and how much, telling him that he wanted to find out all the stock that was out.   These letters were written along through the year 1884, and the last one just after the entering of the above decree, as near as witness was then able to fix the date.   So also, Commissioner Brown gave the usual published notice, fixing time and place for the owners to file their claims and produce evidence of ownership.   It will be remembered that the amount of recovery of the Central Improvement Company against the Shenandoah Valley Railroad Company in income bonds was to be and by the court was measured and determined by the amount of the paid-in capital stock of the Central Improvement Company, and hence the importance of having it all in.   Mr. McFadden saw fit to stand out, and declined to produce his evidence of ownership of stock until the amount of recovery on the above basis had been unalterably fixed at one hundred and thirty eight thousand one hundred dollars.   If it is not included in that sum, about which there has been a costly and vexatious dispute, the fault, in part at least, is his, for he sat idly by without any sufficient excuse for his non-action.   Now, he comes into the cause, and presents as his evidence of ownership the three following certificates of payment:

"No. 4.   Philadlphia, February 5, 1872.   Received of Charles McFadden, Esquire, two thousand ——— dollars, being a 1st installment of forty *per cent.* on his subscription to one hundred shares of the capital stock of the Central Improvement Company.   $2,000.   John P. Green, Treasurer *pro tem.*   This receipt to be surrendered upon receipt of stock."

"No. 9.   Philadelphia, May 14, 1872.   Received of Charles McFadden, Esq., one thousand dollars, being an installment of 20 *per cent.* on his subscription to one hundred shares of the capital stock of the Central Improvement Company. $1,000.   John P. Green, Treasurer.   This receipt to be surrendered upon receipt of stock."

"No. 14.   Philadelphia, June 24, 1872.   Received of Chas. McFadden, Esq., one thousand dollars, being an installment of 20 *per cent.* on his subscription, one hundred shares of the capital stock of the Central Improvement Company.   John

P. Green, Treasurer. This receipt to be surrendered upon receipt of stock."

The stockholders of the Central Improvement Company found by their decree for the sale of the Shenandoah Valley Railroad that in order to reach their claim of eight hundred thousand dollars they would have to bid the sum of six million six hundred thousand dollars. In this emergency they called a meeting of stockholders, formal or informal, to see if anything could be done. A committee was appointed, charged with the duty of securing a bidder for the road, and it was empowered to use the assets of the company at its discretion to accomplish that purpose. This, I suppose, would be regarded as an informal meeting of owners of stock; but there was present, either by present action or subsequent ratification, sixty seven sixty-ninths of the stock. It resulted in their securing a bidder by giving such bidder two hundred thousand dollars out of the stock thus to be realized in full. This bonus was afterwards reduced to one hundred and sixty thousand dollars, with which sum the fund in court was charged before distribution. This was done by the consent of the numerous creditors of the Central Improvement Company, whose claims were thus paid to the last cent, amounting to about three hundred and eighty two thousand dollars; and without such arrangement, neither they nor the subordinate stockholders' claim would have realized one dollar. This is shown to have been proper, and eminently wise and discreet, and under the circumstances of the hard times of 1873, fortunate. Such is shown to be the fact as far as the probabilities can show a fact by an overwhelming array of testimony, for there is no attempt to show any fact tending in any degree to establish the contrary. This was a matter for the owners, and the Court has nothing to say on the subject; but Mr. McFadden says he did not participate in forming the committee, and is not bound by their action. Surely, I can not be mistaken in saying that as against him, in order to pay the creditors of his elsewise insolvent company, the charging of the fund with this one hundred and sixty thousand dollars was right. It was also right in view of the

interests of the stockholders as against him, the only one having any interest who is heard to complain.

The court also charged the fund before distribution with attorney's fees to the amount of two hundred thousand dollars. This was based on a private arrangement for contingent fees of one-fourth and more of the recovery made between client and attorney with which, for the most part, the court has nothing to do, and as to which creditors of this elsewise hopelessly insolvent company whose claims aggregate three hundred and eighty one thousand nine hundred and ninety six dollars and seventy one cents do not complain, and which is agreed to and insisted upon as right by one hundred and thirty four in value and out of one hundred and thirty eight of the stockholders. I am not sure but what, taking into consideration the interests of the creditors of the Central Improvement Company, it was right; but we do not wish, under any circumstances, to give our sanction to a growing evil of the courts, *viz.,* without any contract between client and attorney, their charging large fees against the fund to be distributed. Therefore, we are of opinion that Mr. McFadden's claim should not be charged with any part of the attorney's fees, and in so far as the decrees complained of do so, they are hereby reversed; but in lieu thereof, reasonable, customary and proper charge, if any, on his claim, in favor of those attorneys who had for him and others the conduct of the case, should be made. With this modification to be made in the court below, the rest of the decrees complained of are affirmed, and the cause is remanded for further proceedings.

———

DENT, JUDGE *(concurring)*:

The conclusion reached by the majority of the court on reargument being in accordance with the true principles of equity, as I understand them, I feel in duty bound to change my dissent from their determination to a concurrence therewith, for the following reasons:

By a decision of this Court in the cases of *Fidelity Insur-*

*ance, Trust & Safe-Deposit Co.* v. *Shenandoah Val. R. Co.,* and *Crumlish* v. *Same* (delivered March 20, 1890) 33 W. Va. 761 (11 S. E. Rep. 58) the paid-up capital stock of the Central Improvement Company was ascertained and fixed at one hundred and thirty eight thousand dollars, as a basis of recovery against the Shenandoah Valley Railroad Company. By the present decision it is ascertained and fixed at one hundred and sixty four thousand dollars for the purposes of distribution. The commissioner's last report on the subject shows it to be not less than one hundred and seventy thousand dollars. The difference between the two decisions of the Court amounts to twenty six thousand dollars, which, according to the basis fixed for recovery in the first decree would, if it had been before the court at that time, increase the recovery by the sum of seventy thousand seven hundred and eighty eight dollars, being double the said twenty six thousand dollars, with interest added to a certain fixed date. This sum was entirely lost to the stockholders of the Central Improvement Company because of the ascertainment of the wrong amount by the court on insufficient data. It can never be corrected, but is finally lost, as the opinion of the Court holds that the question of recovery is *res adjudicata.* Who, then, should bear this loss? The law of estoppel is: "Where a party fails to make his rights known, where fairness and good conscience require that he should do so, to protect the interest of others, he can not be heard as against them to assert such rights." Herm. Estop. § 787. Also, *Id.* 760: "Nobody ought to be estopped from averring the truth or asserting a just demand unless, by his acts or words or neglect, his now averring the truth or asserting the demand would work some wrong to some other person, who has been induced to do something, or to abstain from doing something, by reason of what he had said or done or omitted to say or do." And the converse is true. A person who has rights which he omits to assert at the proper time and place will not be permitted afterwards to assert them if by so doing he will cause an injury or loss to another person which could have been avoided had he exercised that due diligence which a court of equity requires of all persons seeking its as-

sistance. Admitting that the basis of one hundred and thirty eight thousand dollars is wrong, yet those who by their failure to assert their claims occasioned the establish-ment of this wrong basis are forever precluded from disput-ing its truth. And it matters not whether their quiescence, neglect or silence mislead the court or other persons in inter-est; the result of their failure to act is the same, and they, and not those who have been attentive and active, must bear the consequences of their own negligence. "Whenever one of two innocent parties must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Applying these recognized principles of equity, fair dealing, and good conscience to this case, what is the result?

In December, 1882, H. H. Crumlish, a stockholder in the Central Improvement Company, brought a chancery suit for and on behalf of himself and all other stockholders who would aid in prosecuting the suit, to compel the Shenandoah Valley Railroad Company to account for and pay over the assets of the Central Improvement Company, in its control. Immediately stockholders representing nearly one hundred and thirty thousand dollars became active and vigilant with their time, labor and means in prosecuting said suit, and have continued so during the whole of this litigation. They promptly made known the amount of stock held by each, and did everything within their power to get at the truth of the whole matter, and secure a prompt adjustment thereof. These appellants and those they represent, on the other hand, so far as any stock was owned or claimed by them, were in a state of absolute nonentity. No information could be obtained from them or about their ownership of stock.

Mr. C. W. McKeehan, who was a stockholder and became secretary of the Central Improvement Company in 1877, and continued as such until 1884, the books not showing, under-took, in the interest of the stockholders, to find out who were the actual stockholders in the company, and what amounts of stock each held. This was about the year 1884, and was done in view of the pending litigation. He called on the son and executor of Thomas A. Scott, deceased, and

he informed him that he knew nothing about his father having any stock, and had no evidence thereof. He saw Mr. R. D. Barclay, the former president of the company, and business manager of Thomas Scott's private affairs, and also Mr. John P. Green, formerly secretary and treasurer of the Central Improvement Company, and representative in some capacity of said Scott, and they both informed him that they knew nothing about it. It had been so long ago. These two men, who, as they afterwards testify, held the offices of president, secretary and treasurer of the Central Improvement Company from and including the year 1870, to and including the year 1874, by virtue of the stock they subscribed for Thomas Scott in their names, could not remember that he ever had any stock in the company. And he therefore concluded that Mr. Scott owned no stock. As to Judge Jewett's owning any stock, he never knew anything, neither from the books nor outside claims. He wrote several letters to the appellant McFadden, to know whether he had any stock, and if so, the amount thereof, and could get no response from him. The books and papers of the company which had been kept by Mr. John P. Green contained no information as to any of these parties holding any stock. On the 26th day of June, 1889, the deposition of this same John P. Green, secsetary and treasurer as aforesaid, was taken for the third time during the progress of this litigation, for the purpose of ascertaining and fixing the amount of the paid-up stock of the Central Improvement Company, and he testifies that it was at least one hundred and twenty eight thousand dollars, and he thinks it was one hundred and thirty eight thousand dollars. Indeed, he is positive it was the last named sum. Acting on this information, this Court, as heretofore mentioned, definitely determined, irrevocably, this paid-up stock to be the latter amount. This sum, so ascertained, exceeded by several thousand dollars the amount of stock actively engaged in the prosecution of this suit. Such being the case, the holders of this stock were satisfied with this amount and were utterly without suspicion that it could be any greater sum, as they had not the least information that such stock could in any possible way exceed this sum. On the

contrary, their information was, if anything, that it was less than this sum, and that they represented almost the entire amount. Therefore, they had no reason to, and made no effort to increase the finding, either in the Circuit Court or the Court of Appeals, but, feeling safe, allowed it to become a matter of final adjudication.

After, on this basis, a recovery was had against the Shenandoah Valley Railroad Company, amounting to nearly eight hundred thousand dollars, the known stockholders actively engaged in this litigation called a meeting in the Drexel Building in the city of Philadelphia, which had been the principal place of business of said company, after having given notice thereof in a newspaper, as required by the by-laws of said company, and after doing everything they were able to do to get all the stockholders present on the 25th day of April, 1890, for the purpose of taking the necessary steps to realize on their large, but doubtful recovery aforesaid, which was regarded almost as a hopeless undertaking. These appellants and those they represent had not yet discovered their ownership of any stock. With the exception of James P. Scott they did not yet put in appearance, although from their subsequent conduct, it is not a violent presumption to hold that they or those they represent were fully aware of and had an opportunity of attending or being represented at the meeting; but they purposely abstained from so doing, because the fruit was not yet ripe for the plucking. These stockholders, believing that they had the right so to do, as the owners and representatives of all the known stock, and that they were acting in the interest of all, through the committee then appointed by them, without any objection from any source, pledged one hundred and sixty thousand dollars of this doubtful recovery for the purpose of securing the residue of six hundred and forty thousand dollars; and, as the evidence shows, they did through this pledge, beyond dispute, secure this last amount for the payment of expenses, debts and distribution among stockholders. The evidence shows indisputably that this expenditure turned what was otherwise a doubtful recovery, without market value, into a tangible fund, under the control of the court. Then, for the first

time, to wit, in February, 1891, these dormant claimants begin to show active life, and take a personal interest in this litigation. The memories of Barclay and Green, which have been heretofore so blank, are suddenly refreshed, and they can now so easily remember that Thomas A. Scott, deceased, subscribed for four hundred shares of stock in their names, and that he paid for it to said Green, through said Barclay; that Judge Jewett subscribed for one hundred shares of stock, and paid for it to said Green; and that Charles McFadden had a like subscription paid for in a like manner. This evidence, if true, was in the knowledge and under the control of these appellants, or those they represent, at the beginning of this litigation; yet they continually denied any knowledge of having any stock, or led the other stockholders by their silence to believe that such was the case. The certificate book is produced in evidence, and the stubs thereof, in the handwriting of John P. Green, show the issue of one hundred and thirty thousand dollars of stock to various parties, but none to Thomas A. Scott, Judge Jewett or Charles McFadden. This is a very significant silence. These certificates were signed by Green, as secretary and Barclay as president, both in the employ of Thomas A. Scott, although the stock was subscribed for in their names, and by reason thereof they were enabled to hold the offices and control the management of the company until its funds were all received and expended. In addition to the above, A. K. McClure paid five thousand dollars on stock, for which he received no certificate, and Joseph L. Morton paid five thousand dollars, for which he received no certificate, making a total of paid-up subscriptions, counting that claimed by appellants, of one hundred and seventy thousand dollars. But Mr. Green swears to and accounts for only one hundred and thirty eight thousand dollars. What became of the other thirty two thousand dollars? It will not do to say it was paid in labor, because the evidence does not justify it. There has been either a defalcation in the funds or an over-issue of stock, and to take the most charitable view of the matter is that while this stock was paid for by Scott and Jewett, it was afterwards transferred to and issued to some one else, the money

going back to Scott and Jewett; and Barclay and Green, who were in Scott's employ all the time, after the stock was so issued and the money returned to Scott, his two servants, no longer being stockholders, resigned their positions, because their employer had no longer any interest in said company. This is certainly a reasonable conclusion, considering the conduct of these parties during the whole progress of this litigation. But in my opinon, this matter as to whether these parties had or had not stock has nothing to do with the just determination of this case. It is very evident, with the present state of the proofs before it, that this Court, instead of fixing the paid up stock of the Central Improvement Company at one hundred and thirty eight thousand dollars, would fix it at one hundred and sixty four thousand dollars. This change has been brought about by the testimony of Green and Barclay, and the present activity of these appellants, seeking to profit at the expense and labor of others; and it is just as evident that it was in the power of these appellants to have ascertained and made known this proof before the court immutably fixed the amount of the paid-up stock on which the recovery was based; and it is their culpable negligence in not asserting their claim to stock at the proper time—that is, right at the inception of the litigation—that occasioned to the stockholders the loss of the seventy thousand seven hundred and eighty eight dollars, as before stated. On whom then, should this loss fall? The equitable law of estoppel says, as herein quoted, on him whose failure to act occasioned it; in this case, the appellants. A surety is released from payment of debt for indulgence to his principal and indorser for want of notice; and a *bona fide* purchaser for value, for neglect to record his deed, loses his land. The slight oversight of one person may result in the loss of thousands of dollars to entirely innocent parties, whom the policy of the law holds liable for his negligence.

Equity ever favors those who are prompt and diligent in the assertion of their rights, and frowns with displeasure on those who listlessly stand by during the heat of battle, and, after the smoke has rolled away, come bravely forward, and seek to deprive others of the well deserved rewards of their

vigilant efforts.   As Judge Holt says in the case of *Clark* v. *Figgins*, 31 W., Va. 15 (5 S. E. Rep. 643):   " '*Vigilantibus non dormientibus jura subveniunt.*'   There would be no reward to the vigilant if these parties were now compelled to step aside, and let those who stood by and did nothing take the fruits of their labor and expense, or were compelled to divide it with them."   It would be paying a premium to idleness.   "To the victors belong the spoils," is not an inequitable doctrine, but underneath it lies the strongest principles of reciprocity and justice.   Not only did these appellants or those they represent stand idly by for almost ten years of a hard fought legal battle, but, when importuned by those whom they should have been mutually aiding and supporting, they either denied all knowledge of personal interest, or treated with contemptuous silence such importunities; and now that fortune has crowned years of labor with success, in the face of every discouragement, these laggards in the contest come bravely to the front, and demand, not alone a participation in the results, but repudiate any responsibility in the necessary expenditures by which they were achieved.   Partners they would be in the profits, but not in the labor, expense, or losses. Justice and equity both require that before they share in the distribution, they should make good the loss occasioned by their culpable inertia and inequitable silence.   This loss, to wit, seventy thousand seven hundred and eighty eight dollars, exceeds any share they can possibly receive in the fund, distributable, after deducting therefrom the reasonable and legitimate expense of creating it, and therefore precludes them from any share in the distribution.   The finding of the commissioner and the decree of the Circuit Court, in my humble opinon, are founded on the true principles of equitable participation, and should therefore be affirmed, except as modified in the opinion of Judge Holt, in which I now concur.

------

BRANNON, JUDGE (*dissenting*):

When this case was decided at a former term, after the best consideration which I could give the evidence, I was of opinion that the last report of Commissioner Brown, finding

Jewett and Scott to be stockholders, is correct. I still remain of that opinion, and dissent from the action of a majority of the Court at this term, excluding them. I prepared at the former hearing the following opinion, which was then assented to by three judges:

This is an appeal taken by the adminstrators of Thomas A. Scott, deceased, and the administrator of Thomas L. Jewett, deceased, from decrees of the Circuit Court of Jefferson county in the two cases, heard together, of *Crumlish's Adm'r v. Shenandoah Val. R. Co. and others*, and *Fidelity Insurance Trust & Safe-Deposit Co. v. Shenandoah Val. R. Co.* By a former decision in this Court by these causes, reported in 33 W. Va. 761 (11 S. E. Rep. 58) an indebtedness was established against the Shenandoah Valley Railroad Company in favor of the Central Improvement Company, which a commissioner afterwards found to be eight hundred and twenty thousand three hundred and fifty three dollars and eighty one cents, as of February 10, 1891. After the case returned from this Court to the Circuit Court on May 30, 1890, a reference was made to a commissioner to report who were stockholders of the Central Improvement Company entitled to participate in said fund, and the respective amounts to which they were entitled, and to audit debts against said company, and to settle the accounts of the special receiver, and ascertain what would be reasonable compensation for expense incurred by him, and a fair allowance of fees of counsel employed by him. In March, 1891, the petitions of the foreign executors of Thomas A. Scott, deceased, and of Thomas L. Jewett, and the petition of Charles McFadden were filed, respectively claiming that the estates of said Scott and Jewett were stockholders and said McFadden was a stockholder in the Central Improvement Company, and entitled to participate in its distributable assets. Certain decrees were entered prejudicial to the estates of Scott and Jewett, and then Davis, as administrator *c. t. a.* of Scott, and as administrator of Jewett, appointed as such in West Virginia, filed their petitions, claiming that their decedents had been stockholders in the Central Improvement Company, and asking for their estates a participation in said fund, and praying that said decrees be re-

heard and reformed. The cases went on, resulting in a decree, not only not rehearing and reforming prior decrees complained of by Scott's and Jewett's representatives, but wholly denying to the estates of Scott and Jewett any participation as stockholders in said fund, and dismissing their petitions, and according to McFadden participation to only a partial extent of his claim; and they appealed here.

I have stated such facts as bear on the first question which I will decide, and that is whether Davis, the West Virginia personal representative of Scott's and Jewett's estates, can maintain this appeal. It is said he can not; that the foreign representatives were parties when decrees containing certain features prejudicial to said estates were made, and they alone can complain of them, that in fact, Davis can hold no place as appellant either as to those decrees made before he appeared or since, as the foreign representatives were received and recognized as parties by the court, and have never been eliminated from the case, and both a foreign and domestic adminstrator can not represent the estate in one suit. This contention can not be sustained. A foreign personal representative can not sue or be sued outside the state granting him authority. *Hull* v. *Hull,* 26 W. Va. 15; *Vaughan* v. *Northup,* 15 Pet. 1; Bart. Ch. Prac. 152; *Dickinson* v. *McCraw,* 4 Rand. (Va.) 158; Story Confl. Law § 513; *Dixon* v. *Ramsay,* 3 Cranch 319; *Fenwick* v. *Sears,* 1 Cranch 259; 1 Lomax Ex'rs 121; 1 Rob. Prac. (new) 161; *Andrews* v. *Avory,* 14 Gratt. 229; 1 Lomax Ex'rs 142; *Doolittle* v. *Lewis,* 7 Johns. Ch. 45; *Fugate* v. *Moore,* 86 Va. 1049 (11 S. E. Rep. 1063). The fact may be pleaded in abatement or in bar. *Noonan* v. *Bradley,* 9 Wall. 394.

Without discussing what would be the effect of a decree for a foreign administrator where no question is raised, yet I can safely say that not only the defendant can raise objection, but that when a suit like this is pending, involving a fund wherein a decedent has a share to be recovered, by intervention in the case, the administrator deriving his authority in the state in which the fund is located, may come into the case and demand that his decedent's share be decreed to him, notwithstanding a foreign administrator has be-

fore intervened and claimed it; and this because it is the administrator appointed in the state where the debt is owing who alone has title to it, and therefore can sue for it, the foreign administrator having no title. When the administrator *loci rei sitae* makes his appearance in the case, and is recognized, he displaces and eliminates the foreigner. Both can not be longer recognized, and he must be recognized who has title, and whom the law recognizes. This is a suit in equity. All being before the court, can not, ought not, the court to decree the rightful party? The case of *Dearborn* v. *Mathers,* 128 Mass. 194, relied upon by counsel to support the position above mentioned, was a case where a foreign administrator sued and obtained a verdict, and then a new trial was asked, because it had been discovered that his letters had been granted out of the state; and the court said that the objection should have come by plea earlier, and as the granting a new trial was in discretion, and the plaintiff had after verdict and before judgment qualified in the state of the actions, and thus, before judgment, become possessed of title, and would be liable on his bond, and thus no loss could come to the defendant, a new trial was refused, and judgment rendered. There the plaintiff became before judgment vested with title by letters relating back to testator's death.

The next question is, were Scott and Jewett stockholders in the Central Improvement Company? The commissioner reported on the evidence that Scott had subscribed and paid for twenty thousand dollars, Jewett five thousand dollars, and McFadden five thousand dollars of stock, but had no certificates. I shall not here detail the evidence upon what is purely a question of fact, as I conceive that the purpose of the requirement that we shall give reasons for our decisions refers to legal principles of decision, and was not designed to encumber the Reports with mere evidence, affording no guidance in future cases, like legal principles. Suffice it to say that upon examination of the evidence, we find that Scott, Jewett, and McFadden were such stockholders. The want of certificate does not alone furnish the test of whether a person is a stockholder in a private corporation. He is a

stockholder who has subscribed for and paid for a given number of shares in its capital, as these parties did. The stock is one thing; the certificate quite another. The certificate is merely evidence, but not the only evidence of ownership of stock. The owner of stock is a shareholder without it. Cook, Stock, Stockh. & Corp. Law, § 10; *Hawley* v. *Upton*, 102 U. S. 314; 1 Beach, Priv. Corp. § 62.

Scott and Jewett so being stockholders, the next question is, were Scott and Jewett properly denied any share in the fund in court as the property of the corporation, the Central Improvement Company? Various arguments are made to justify such exclusion. I will state the facts which seem to me to bear on this branch of our inquiry in this case. It will appear from the former decision in this case (33 W. Va. 775 (11 S. E. Rep. 58) that the basis of recovery by the Central Improvement Company against the Shenandoah Valley Railroad Company was under a certain agreement between them, which provided that the Shenandoah Valley Railroad Company should deliver the Central Improvement Company two hundred and fifty thousand dollars second mortgage bonds of the Shenandoah Valley Railroad Company, and income bonds, measured in amount by double the amount of stock of the Central Improvement Company paid in; and, on account of the failure to deliver said bonds this Court debited the Shenandoah Valley Railroad Company with two hundred and fifty thousand dollars, with interest, on account of the second mortgage bonds, and with three hundred and seventy nine thousand two hundred and twenty four dollars on account of the income bonds, reaching the latter sum by taking one hundred and thirty eight thousand dollars as the amount of stock of the Central Improvement Company which had been paid in, with interest, and then doubling it. When the commissioner was executing a reference requiring him to report who were stockholders of the Central Improvement Company entitled to share in this money, the Norfolk & Western Railroad Company appeared to own one hundred and twenty eight thousand dollars stock (later increased to one hundred and thirty four thousand dollars), and

claimed that one hundred and thirty eight thousand dollars as stock paid in was an unchangeable, immovable given sum in the problem of distribution, and that it must get of the amount to be divided among stockholders in the proportion which one hundred and thirty four thousand dollars bears to one hundred and thirty eight thousand dollars. This would leave an open space for only four thousand dollars of stock in other hands, and would not let in the whole thirty thousand dollars of stock owned by Scott, Jewett, and Mc-Fadden. Their thirty thousand dollar stock added to the one hundred and thirty four thousand dollars of the Norfolk & Western Railroad Company would make one hundred and sixty four thousand dollars of paid up stock.

Then Scott, Jewett and McFadden contend that the amount divisible among stockholders must be divided on a basis treating one hundred and sixty-four thousand dollars as the amount of paid-up stock of the Central Improvement Company, while the Norfolk & Western Railroad Company contend that it must be divided on a basis treating one hundred and thirty eight thousand dollars as the proper amount of paid-up stock. This contention of the Norfolk & Western Railroad Company is sought to be supported upon the theory that the sum of one hundred and thirty eight thousand dollars, as the amount of paid-up stock, is unalterably fixed as a matter of *res judicata* by the former decision of this Court, and constitutes an estoppel against Scott's, Jewett's and McFadden's contending for any other sum. Let us see as to this contention. The object of the suit of *Fidelity Insurance, Trust & Safe-Deposit Co.* v. *Shenandoah Val. R. Co.* was only to enforce a mortgage given by the latter to the former company. We may dismiss that suit from consideration here. The object of the suit of *Crumlish's Adm'r* v. *Shenandoah Val. R. Co.* was to assert a debt against the Shenandoah Valley Railroad Company in favor of the Central Improvement Company. In ascertaining that debt, as above stated, the sum of one hundred and thirty eight thousand dollars was held by this Court as the amount of the paid-up stock of the Central Improvement Company; and on the basis of that sum, a certain

amount was decreed against the Shenandoah Valley Railroad Company for its failure to deliver its income bonds to the Central Improvement Company. That this decision is *res judicata* and an estoppel upon the two corporations, the Shenandoah Valley Railroad Company and the Central Improvement Company, and stockholders of the latter company, for certain purposes, admits of no question. The two corporations were parties, and of course they are bound; and as the Central Improvement Company was a party, and Crumlish was a stockholder of that company, suing for himself and all other stockholders, not only Crumlish, but all other stockholders, are concluded for certain purposes. Then what are those purposes? What the limit of this estoppel?

I do not question the case cited, *Vanderwerken* v. *Glenn*, 85 Va. 9 (6 S. E. Rep. 806) holding that "in a suit wherein a corporation is a party the decree binds the stockholders, though they be not personally parties," nor the case of *Hawkins* v. *Glen*, 131 U. S. 319 (9 Sup. Ct. 739) holding that in the absence of fraud, stockholders are bound by a decree against the corporation in respect to corporate matters, and such decree is not open to collateral attack, when those cases are properly applied. I do not doubt that the sum fixed by said decision as the liability of the Shenandoah Valley Railroad Company to the Central Improvement Company and the elements entering into the process of reaching that sum, including one hundred and thirty eight thousand dollars, considered as the amount of paid-up stock, are forever binding on companies and stockholders. I do not question the proposition that neither the Central Improvement Company nor any of its stockholders can now say that the amount of indebtedness fixed by that decision in favor of the Central Improvement Company was not correctly fixed, or that one hundred and thirty eight thousand dollars paid-up stock, taken as a measure or basis in ascertaining that indebtedness, was not the correct amount for that purpose. The stockholders of the one company can for no purpose say the debt decreed against it is too large; the stockholders of the other can for no purpose say that the debt decreed in its favor is too small, because of untrue data or elements in its ascertainment. The

one hundred and thirty eight thousand dollars treated as paid-up stock then appeared right; but, under evidence since taken, it appears to have been larger. Though wrong, yet nobody can now question it, so far as the amount recovered is concerned. But now that the money stands for distribution among stockholders, the estoppel ceases. It is now a fund in the corporate treasury, first for payment of debts, then for distribution among stockholders according to their holdings. It is simply assets distributable equally among them.

Shall the loss arising from the fact that the evidence then present showed only one hundred and thirty eight thousand dollars paid up be borne by only some of the stockholders? Shall not this loss be shared by all stockholders in common like any other loss? The former decree of this Court, while it fixed irrevocably a certain sum as the liability of the Shenandoah Valley Railroad Company to the Central Improvement Company, and bound companies and their stockholders to that sum, did not fix the rights of stockholders as among themselves. The adjudication of the indebtedness of one company to the other is one thing; the adjudication among stockholders of their respective rights as to each other is quite a different thing. The use of one hundred and thirty eight thousand dollars paid-up stock as a factor in the process of the adjudication of the indebtedness of the one company to the other is one use, but its use in the adjudication of the rights of stockholders among themselves is quite a different one. For the one purpose, its use as a factor in fixing that indebtedness, it stands immovable, since it did enter into the adjudication of a specific sum of indebtedness; but for the other purpose, as a factor in settling the rights of stockholders among themselves, it not only is not immovable, but it is not a factor, since it was not used in that matter, as that matter was not passed on by this Court. That matter has never been passed on by this Court. It simply passed on the indebtedness between the two companies, but not on the rights of stockholders among themselves. That was not the point passed upon by the former decision. To make an adjudication an estoppel, it must appear that the same precise

question or matter was adjudicated in the former adjudication or was necessarily involved in the adjudication. *Western M. & M. Co.* v. *Virginia Cannel Coal Co.*, 10 W. Va. 250. The prior decision is conclusive, not only as to the matter actually determined, but also any other matter which the parties might have litigated, and 'had decided as incident to, or essentially connected with, the matter actually determined, coming within the legitimate purview of the action. *Sayre's Adm'r* v. *Harpold*, 33 W. Va., 553 (11 S. E. Rep. 16); *Rogers* v. *Rogers*, 37 W. Va. 407 (16 S. E. Rep. 633). Now the rights of the stockholders among themselves was surely not the subject-matter of the former decision of this Court, but the liability of one company to the other was that main subject-matter; nor were the rights of the stockholders among themselves necessarily involved in the settlement of the indebtedness between the companies; nor were the respective rights among themselves incident to or essentially connected with the adjudication of the indebtedness of the one company to the other. Their rights had nothing to do with that indebtedness, but were irrelevant. What had the Shenandoah Valley Railroad Company, as debtor to the Central Improvement Company, to do with the rights of the stockholders of the Central Improvement Company? The bill of Crumlish had three main objects in view for relief: *First.* The recovery of a debt in favor of the Central Improvement Company against the Shenandoah Valley Railroad Company; *second,* the ascertainment and payment of debts of the Central Improvement Company; *third,* the division of its assets among stockholders. Here were three separate and distinct purposes. The first object—the recovery of the debt against the debtor company, the only property of the other company—must be accomplished before the debts could be paid, and the balance distributed among the stockholders. A decree upon the single subject of the indebtedness of one company to the other was entered in the Circuit Court, leaving the other matters untouched, and that decree was brought here for review, and this Court passed upon that matter, leaving other matters untouched. How can this decree in any wise preclude action upon the matter of the distribution among

stockholders? It is every day's practice, when a bill calls for several different reliefs, to decree upon one, leaving the other intact; and, unless the things pertaining to one be necessarily involved in or essentially incident to the adjudication, it does not affect the relief to be afterwards given on other matters. For purposes of estoppel under the doctrine of *res judicata*, there must be identity of causes of action in the two controversies. 1 Greenl. Ev. § 528; Bigelow Estop. 75. There being three several matters contemplated as subjects of relief by the suit, we may say, for the present purpose, that there were three suits. The former decision was upon a trial of the first —indebtedness between the companies, arising from transactions between them. This controversy is upon another cause of action, arising from another transaction—that of subscription of stock, giving stockholders a cause of action against their corporation; and out of it arose controversy between stockholders. On the trial of the former the subject of the latter—the subscription of stock and amount paid therefor—came in only as evidence or collaterally, and was only incidentally cognizable. This will not make it an estoppel against the truth, so as to prevent the stockholder from showing that the amount of paid stock was greater than one hundred and thirty-eight thousand dollars. 1 Greenl. Ev. § 528; *Coville* v. *Gilman*, 13 W. Va. 314, 329, 332, 333; *Henry* v. *Davis, Id*. 230, pt. 4; *Ford* v. *Ford*, 68 Ala. 141; 2 Black. Judgm. §§ 611, 612, 622. Facts in a controversy on a trial, but not necessarily involved in the issue, though ever so important in its determination, are not settled by a judgment, but are open to controversy in any other suit between the same parties. *Beckwith* v. *Thompson*, 18 W. Va. 103. Not until the case went back from this Court did the Circuit Court take any action upon the matter of ascertaining and paying debts of the company, and settling the rights of stockholders, which it did by the reference to a commissioner to audit debts, and ascertain who were stockholders entitled to participate in the fund, and the amounts to which they were entitled. And the contention is that this one hundred and thirty-eight thousand dollars must be taken as the basis of the total sum charged to the

Shenandoah Valley Railroad Company for second mortgage bonds and income bonds, though it was a factor only in fixing the charge for income bonds, and had nothing whatever to do in fixing the charge for second mortgage bonds. I have devoted so much space to this subject of *res judicata,* because it was so elaborately discussed and strongly relied upon in the able briefs of counsel and their oral argument.

Another ground for the insistence that one hundred and thirty eight thousand dollars must be taken as the full amount of paid-up stock is that the commissioner, after reporting that the Norfolk & Western Railroad Company owned one hundred and twenty eight thousand dollars stock of the Central Improvement Company, remarked, apparently to show why he had not reported more stock, that it appeared from the records of the two suits that stock has been issued aggregating one hundred and thirty eight thousand dollars, but that he had not discovered to whom the excess belonged, and this report was confirmed without exception as to that point.  In the first place, I doubt whether this can be called an actual finding as a fact that only one hundred and thirty eight thousand dollars stock had been paid up; and moreover, the commissioner says:  "There appears to have been stock issued and aggregating par value of one hundred and thirty eight thousand dollars."  What is meant by "stock issued?"  Does it mean certificates issued?  There could be stock without certificates.  The order of confirmation reserved right, if Scott's and Jewett's representatives should show themselves to be stockholders, to except to the allowance by the report of fees and commissions, but confirmed it in other respects.  It is plausibly argued that as yet the claimants had no standing in court, because they had yet shown no right to stock.  The fair construction of the order is, as I think it is, that as the fixing one hundred and thirty eight thousand dollars concerned them as stockholders, the right to except to that is to be regarded as reserved.  But perhaps this is immaterial as the decree of May 30, 1891, unequivocally confirmed that feature of the report.  But it is an adequate answer to this contention that not till after said report was confirmed did the West Virginia administrators

of Scott and Jewett appear in the cause by petitions, setting up the claims of their decedents to stock, and ask that all prior decrees be reheard and reversed. Upon these petitions such order of confirmation of said report would be reheard and reversed. The prior proceedings, though the foreign representatives were before the court, did not conclude the adminstrators appointed in this state. By their petitions they excepted to said reports and former decrees. The report found the stock paid up one hundred and thirty eight thousand dollars on the evidence of the record alone, as it says, on the theory that this Court had unalterably fixed that sum, and that it was binding upon the stockholders *inter sese,* which we have seen is not the case. The commissioner, though he afterwards found that other stock had been paid for, felt himself bound, in making subsequent reports, by the former confirmed report. No petition to rehear was filed until one was filed in December, 1891, by Davis, administrator, and McFadden. Upon them the Court should have reviewed and corrected said decree, confirming said report. No matter what we call the petitions, full as they are, of matter showing title to cause of action, and for relief, assigning errors in former orders, and asking review, be the name what it may, petition by stranger just coming in, petition for rehearing, or bill of review, containing matter sufficient, it will be given effect according to its matter, regardless of name. *Sturm* v. *Fleming,* 22 W. Va. 404; *Martin* v. *Smith,* 25 W. Va. 579. I regard them as petitions of strangers intervening asking relief in the cause, and, as incident, the rehearing of former orders, and to be treated as to those orders as a petition for rehearing, and they ought to be treated certainly as liberally as petitions for rehearing as was the pleading called bill of review in *Martin* v. *Smith, supra,* filed by a nonresident. If we were to call it a bill of review, it would call for reversal of those orders for error of law appearing on the face of the record, not looking into evidence, but only to the face of the report; and so if we call it a petition for rehearing, and then we could look into the evidence; and so if we call it an original petition by a stranger intervening for the first time. For myself, I do not regard those orders, not carried

into actual decree at the time the petitions were filed as final, but only interlocutory, and reviewable on the hearing for the error on the face of the record, even did these petitions not ask rehearing, but only relief inconsistent with such orders. *Hyman* v. *Smith*, 10 W. Va. 298; opinion in *Fowler* v. *Lewis' Adm'r*, 36 W. Va. 129 (14 S. E. Rep. 447). This appeal brings those orders up. *Lloyd* v. *Kyle*, 26 W. Va. 534.

Another reason suggested for adhering to the sum of one hundred and thirty eight thousand dollars as the basis of distribution is that the commissioner's report of October 23, 1891, fixes the distribution; and that his finding, resting on that basis, is upon a question of fact; and that the law being that when a commissioner and the court have concurred in deciding a pure question of fact, this Court will give the finding great weight, unless it plainly appears to be wrong. *Fry* v. *Feamster*, 36 W. Va. 454 (15 S. E. Rep. 253). By the report above mentioned, the commissioner took said one hundred and thirty eight thousand dollars as the amount of paid up stock, and after deducting debts, commissions, *etc.*, he allowed the Norfolk & Western Railroad Company, as owner of stock of the Central Improvement Company, a share in the fund for distribution among stockholders based on an ownership of one hundred and twenty eight thousand and fifty dollars of stock, its share being fifty seven thousand and eight dollars and eighty six cents, and left only a balance of the distributable fund of four thousand four hundred and twenty nine dollars and seventeen cents for other shareholders; and by decree of May 30, 1891, the court again referred the case to him to report who was entitled to said balance of our thousand four hundred and twenty-nine dollars and seventeen cents; and the commissioner reported, October 23, 1891, that Scott and Jewett were not entitled, and the court confirmed the report. We can not, it is argued by counsel, apply the principle announced in *Fry* v. *Feamster*, *supra*, to this report, for the reason that it is not a finding on a pure question of fact; or rather, the ultimate fact found is only an erroneous legal conclusion from other facts already found, which called in law for a different finding. The commissioner had found in a former report, and repeated it in

this, that Scott and Jewett had subscribed and paid for twenty five thousand dollars stock, and that alone called for a report in favor of their participation in the distribution. But as there was some evidence raising the question whether Scott and Jewett remained still stockholders, we may not be able to say that the finding against their right to share in the fund was purely an erroneous legal conclusion. But this I say, that it being found, and rightly found, that Scott and Jewett had subscribed and paid for stock, it was incumbent on those who denied their continued ownership to prove it, and that the evidence fell very far short of proving it, and the finding against them was contrary to the evidence.

A further plea for the exclusion of Scott and Jewett is their *laches.* This plea is wholly untenable, but in deference to counsel I refer to it. Wherein are Scott and Jewett chargeable with *laches*? One counsel says, only in failing to get certificate of entry on the books to show they were stockholders. Surely, this ought not to exclude them. As to entry in company's books, they had right to presume it would be done. It was not their fault, and the commissioner reports that substantially all the company's books and papers were lost. Certificates of stock are not indispensable as evidence of stock ownership. Scott had receipts for payment for stock, but they were mislaid. It is said they should have presented their stock, so that it would have been known that the paid-up stock was more than one hundred and thirty eight thousand dollars, so that the recovery against the Shenandoah Valley Railroad Company would have been larger. We do not know that they knew of Crumlish's suit to enforce the company's liability against the Shenandoah Valley Railroad Company. They were non-residents. There was no convention of stockholders; no order to ascertain them until August, 1890. Scott died in 1881; Jewett in 1875. Their representatives appointed in Pennsylvania appeared to claim their stock in February, 1891, and kept on claiming it. The personal representatives appointed in this state filed petitions claiming this stock in December, 1891. Papers to prove payment for stock, are lost. Neither Scott nor Jewett nor

their representatives were parties except constructively by Crumlish (a stockholder) and the company being parties. And if these stockholders knew of the suit, would they not have right to assume that their company would furnish the true amount of paid-up stock in order to recover the true amount of the debt? Are they more remiss in this than others? And why is it assumed that the stock of the petitioners was not a part of that one hundred and thirty eight thousand dollars? It was paid in cash, and part of the other stock was not. Was all the other stock present, and this alone absent? No other stockholder appeared but Crumlish until after the order for their convention. It would be inequitable to visit on them the burden of the failure to recover of the Shenandoah Valley Railroad Company as much as would have been recovered had their stock been known. Both the stockholders were dead; their papers lost. No other stockholder, except Crumlish, appeared, or did more than they. It is needless here to speak of the zealous efforts of the personal representatives of Scott and Jewett, commencing in February, 1891, to secure the fruits of this stock.

As to Scott's ownership of stock, a plea of *res judicata* is relied upon as specially applicable to his ownership. In 1874, a suit in equity was brought by Jefferson county as a stockholder against the Shenandoah Valley Railroad Company to annul three contracts between the Shenandoah Valley Railroad Company and the Central Improvement Company, because, among other reasons, when two of said contracts were made, Scott was president and director of Shenandoah Valley Railroad Company, and stockholder in the Central Improvement Company, and the bill charged that he was a stockholder, and the answer of the Central Improvement Company denied that he was a stockholder, and the court held those contracts void. The fact that they were held void tends to sustain the claim that he was a stockholder. The fact that the decree finds that Walker and Bardwell were stockholders furnishes a mere implication that Scott was not. The denial in the Central Improvement Company's answer that Scott was a stockholder can not preclude that stockholder's showing himself to be a stockholder. It

can not be possible that an answer of a corporation denying that one is a stockholder in a suit to which he is not a party, where the point comes up only incidentally as evidence, and not involving the adjudication of stockholders' rights, can conclude him against showing in another suit, having for its object the ascertainment of the stockholders and the settlement of their respective holdings, that he is a stockholder. If even Scott has been a party, the answer of a codefendant would not be evidence against him. Let us even suppose that one hundred and thirty eight thousand dollars must be taken as the unalterable amount of stock paid in, where even then the equity of according to the Norfolk & Western Railroad Company its full ratable quota for the one hundred and thirty four thousand dollars owned by it, and denying any part to Scott's and Jewett's twenty five thousand dollars, and allowing McFadden less than his ratable quota, even on the basis that he owned only four thousand dollars stock, as found by the commissioner? The fund was for distribution among stockholders. The fact that it was smaller, by reason of its not appearing by evidence when the case was before in this Court that there was more stock than one hundred and thirty eight thousand dollars, than it would have been had the further evidence been present, can not prejudice one stockholder more than another, ratably. It is a loss common to all. We may say that while the decree of March, 1891, confirming the report finding one hundred and thirty eight thousand dollars as the amount of paid-up stock, as long as it stood, would guide the commissioner, yet it ought not to have controlled the court in its final decree making distribution. The fund was for all stockholders. Why, in equity, should they not have shared by a common percentage?

My conclusion is that Scott's estate is to be treated as a stockholder in the Central Improvement Company in the amount of twenty thousand dollars, Jewett's estate in the amount of five thousand dollars, McFadden's in the amount of five thousand dollars and the Norfolk and Western Railroad Company in the amount of one hundred and thirty four thousand dollars, and they are to share in the fund for dis-

tribution among stockholders ratably by a percentage com-
mon to all of them.

Another important question is, shall the special receiver
have any compensation for services, and if so, what? The
commissioner credited him with sixteen thousand four hun-
dred and sixteen dollars and seven cents, apparently intend-
ed to be two *per centum* of the gross fund realized from the
recovery by the Central Improvement Company against the
Shenandoah Valley Railroad Company. The appellants pro-
test against this charge on the fund, as it lessens their por-
tion. They say he was no receiver, because the decrees ap-
pointing him were reversed. By decree in the Crumlish suit
(November 29, 1887) a special receiver was appointed in the
cause, and authorized to file his petition in the cause of
*Fidelity Insurance, Trust & Safe Deposit Co.* v. *Shenandoah
Valley R. Co.*, brought to enforce a mortgage of the latter
company, and by such petition to seek the recovery of the de-
mand of the Central Improvement Company against the Shen-
andoah Valley Railroad Company, and to take such steps to
that end as he might deem expedient, and to bring any money
recovered into the Crumlish suit for distribution among those
entitled thereto. The receiver gave bond under this appoint-
ment. In February, 1888, Crumlish's administrator and the
receiver filed such petition in the Fidelity, *etc.*, Co. suit, mak-
ing the Central Improvement Company a party, to assert the
demand aforesaid. Afterwards the decree appointing the
receiver was wholly reversed. Afterwards by decree of De-
cember 3, 1889, the Central Improvement Company recovered
of the Shenandoah Valley Railroad Company one hundred
and twenty seven thousand dollars, and a special receiver was
appointed to collect it. He never gave the bond required by
this decree. Afterwards that decree was wholly reversed
by this Court. It is plain that a reversal without reserva-
tion is a reversal *in toto* and ends all powers as to future ac-
tion growing out of the decree or judgment. *Flemings* v.
*Riddick*, 5 Gratt. 272; 2 Freem. Judgm. § 481. After the first
reversal, the Circuit Court adjudicated that the receiver was
no longer receiver, as it reappointed him; but he gave no
bond, and it is held that until he gave bond he is no receiver

and has no title. Code, c. 133, s. 28; *Donahue* v. *Fackler*, 21 W. Va. 124; High, Rec. § 121; 20 Am. & Eng. Enc. Law 162. I think he was lawful receiver from his first appointment up to February 25, 1889, when the first reversal occurred; but I can not see how he was afterwards. There seems to be in the meager authorities on this particular point a difference, as to a right to charge the receiver's compensation on the whole fund, between cases where the appointment was regularly made and where it was not. In cases where it is irregularly made, it seems not chargeable on the fund, as the party in interest may object. I would think with Judge Beck in *Radford* v. *Folsom*, 55 Iowa 286 (7 N. W. Rep. 604) that if jurisdiction existed, its erroneous exercise (in the appointment) would not affect the right of the receiver (as to compensation) as long as the order of the court stands unreversed. But as the appointment is void, or becomes vacated and inoperative by reversal, how can it bind a party? Can he not avail himself of the nullity of the appointment? Perhaps that was among the reasons for which he sought reversal. In *People* v. *Jones*, 33 Mich. 303, it was held that as the appointment was void for want of jurisdiction, the receiver should have no compensation. In *Verplank* v. *Insurance Co.*, 2 Paige 438, the appointment was reversed, and the receiver ordered to give up property and without compensation. In *French* v. *Gifford*, 31 Iowa 428, this distinction is clearly drawn by the holding that the rule that the compensation of a receiver to take charge of the assets and wind up the affairs of an insolvent corporation should be paid out of the fund in his hands generally applies to cases where he closes up his business, and settles his accounts, not to cases where the order appointing him is set aside as improperly made. It was later recognized in *Radford* v. *Folsom*, 55 Iowa 276 (7 N. W. Rep. 604). See Beach Rec. § 773; Gluck & B. Rec. § 105. These cases tend strongly to show that we can not regard this receivership as continuing after reversal of the decree creating it. Its foundation failed.

Should a special receiver be given compensation by way of commission on receipts or otherwise? There is no fixed rule. Often the commissions would be grossly excessive

or often too little. In many instances there is an inclination to allow what are allowed administrators and trustees for similar services. The true rule is that he is an officer of the court, and the court may fix his compensation, giving him what is fair and reasonable under the circumstances of the particular case, rather than by any invariable rule or analogy. *Abbott* v. *Packet Co.,* 4 Md. Ch. 310; *Magee* v. *Cowperthwaite,* 10 Ala. 966; *Gardiner* v. *Tyler,* 42 N. Y. 505; Gluck & B. Rec. § 103; High Rec. § 781. Where the fund is large, it is usual to allow a salary or lump sum. 1 Fost. Fed. Prac. § 258; *Cowdrey* v. *Railroad Co.,* 1 Woods 346, Fed. Cas. No. 3,293; *Farmers' Loan & Trust Co.* v. *Central Railroad of Iowa,* 8 Fed. 60; *Central Trust Co.* v. *Wabash, St. L. & P. Ry. Co.,* 32 Fed. 187. In *French* v. *Gifford, supra,* Miller, J., afterwards Mr. Justice Miller, said: "While we concede that the receiver should receive a compensation corresponding to the high degree of business capacity, integrity, and responsibility required in cases of this character, and which was secured in the person of the receiver in this case, yet we feel it our duty to allow only such sum as will be such reasonable compensation." In *Central Trust Co.* v. *Wabash, St. L. & P. Ry. Co.,* 32 Fed. 188, Brewer, J. said what is obviously law, that the allowance to a receiver is a judicial act, and while it is left to the discretion of the court, it is discretionary only in the sense that there are no fixed rules to determine the allowance, and it is not discretionary in the sense that courts may allow anything more than a fair and reasonable compensation; that the court desired to see officers of the court well paid, so that men of character and ability may be willing to accept the burden and responsibilities of these trusts, but at the same time courts must not forget that the property to be charged with such allowances is not the property of the judges, and that there are thousands all over the land who are owners, whose property by the strong hand of the law has been taken out of their custody and who look to the courts to see that no unjust or excessive burden is cast upon them. Courts may not exercise the generosity of owners, but are closely limited to the justice of judges. In this case there were no assets to care for or pursue but the debt on the

Shenandoah ,Valley Railroad Company, and that came by decree. In fact, very little, if any, actual money came to the hands of the receiver. The Norfolk & Western Railroad Company purchased the railroad of the debtor company, and, owning a large share of the stock of the Central Improvement Company, was simply credited with it on purchase money. The receiver says in a brief filed by himself it paid the attorney's fees and so-called "by-bid" below mentioned, aggregating three hundred and sixty thousand dollars, and that that part of the fund stood for its use, and that the same company owned three hundred and sixty thousand dollars out of three hundred and eighty two thousand dollars of debts audited against the Central Improvement Company; and yet the receiver is given a commission on those sums. It is not made to appear by the record what, if any, actual money went into his hands to be cared for and guarded, which constitutes a large element in the consideration for which receivers are allowed compensation. He made no report of it. He appeared in court February 28, 1893, and admitted that there was then in his hands sixty one thousand nine hundred and forty dollars and three cents distributable among stockholders. That sum, with commissions, debts, and counsel fee, and by-bid, made up the sum recovered against the Shenandoah,Valley Railroad Company; so that, except said sum of sixty-one thousand nine hundred and forty dollars and three cents and commission, no other actual money came to his hands; and of this the Norfolk & Western Railroad Company owned the greater part as stockholder. Indeed, I see no decree directing the money to be paid him save that of November, 1887, which was reversed, as above stated. Thus, there is no ground for basing compensation on commission on the said gross sum, as was done in the report of the commissioner. We must adopt a specific sum. We find that he was a lawful receiver until February 25, 1889. Prior to that time he took some steps of importance in the cause. We can not, as a court of equity, deny him some compensation. It is urged he resisted with the means in his hands the participation of appellants as stockholders. He

.did except to the report of the commissioner finding them to have paid for stock; but this was late, after all service for which he charges or can be allowed had ended.   We do not .see that he used the fund for that purpose.   He appears to have been through years diligent, zealous, laborious, and efficient in the prosecution of the rights of the Central Improvement Company against the Shenandoah Valley Railroad Company under the most adverse and discouraging circumstances rendering its cause at various periods of the litigation to all reasonable appearances a forlorn hope; and though the decrees were reversed, the court still calls him and treats him as receiver.   McFadden, Scott, and Jewett shared the benefit of the services.   I have fixed upon twelve thousand dollars as the total compensation of the receiver, of which Scott's and Jewett's estate and McFadden are to pay their proportionate part.

Another important matter is the allowance by the commissioner out of the fund of two hundred thousand dollars for fees of counsel employed by the receiver in the prosecution of the demand of the Central Improvement Company. While the decree of November 27, 1887, was unreversed, the special receiver employed counsel to prosecute the claim of the Central Improvement Company against the Shenandoah Valley Railroad Company; and they began proceedings and .continued them until they gained their cause in the recovery of the large debt above spoken of.   It is beyond any question fair and truthful to say, in a few words, that the services of the counsel were unremitting through the vicissitudes of victory and defeat in the courts, original and appellate, for twelve years, and able, laborious, zealous and faithful, yielding to none of many discouragements often presenting themselves.   Orders appointing receivers should authorize the employment of counsel, if such is the purpose, as charges are often made for them after service rendered when it is difficult to deny them.   Courts are indisposed to allow re-.ceivers for counsel when their employment has not been before authorized.   High, Rec. § 805.   This decree did not .expressly authorize the receiver to employ counsel; but it .empowered him to prosecute a suit for the recovery of the

claim, and "to take such other proceedings to that end as he may deem expedient;" and as counsel were absolutely necessary, we may say their employment was contemplated by the decree, and at any rate, that it was an act of sound discretion, which under the imperious nature and circumstances of the case, a court ought to approve.   No case ever required the service of counsel more.   True, the decree appointing the receiver fell by reversal, but we hardly think that would vacate the retainer of counsel; and at any rate, these counsel went on term after term in open advocacy of the cause in the court which had appointed the receiver, and it thus recognized their continued relation to the cause.   These services redounded to the benefit of each and every stockholder, and all must bear the burden of fair and reasonable compensation.   If this Court sees, as it does, that such services were essential, and that without them the debt would have been— likely would have been—lost, and the stockholders themselves had not their own counsel, it would seem just to charge, and unjust not to charge, all of them with such services, as they share in the fruits of these services.   That a court of equity may allow receivers counsel fees in proper cases is beyond question.   Their amount is within the sound discretion of the court.  *Stuart* v. *Boulware,* 133 U. S. 78, 10 Sup. Ct. 242.

But the action of a receiver in employing his relatives or friends as counsel on his own motion is open to great abuse, except when specially directed in open court, where the interests involved may be heard, and should be watched with great jealousy by courts.   Courts must realize that they are applying moneys in their grasp belonging to persons who, as the power is largely discretionary, are powerless to resist, absolutely helpless and remediless in courts of the last resort.   Mr. Justice Brewer said in *Central Trust Co.* v. *Wabash St. L. & P. Ry. Co.,* 32 Fed. 187:  "There has been no little implied criticism in the language of appellate courts of the magnitude of the allowances made in foreclosure cases to counsel, receivers, and others.   We are admonished by utterances of the Supreme Court to be cautious in this respect."   He said: "Our duties are as sacred, our responsibilities more solemn,

than those of any other parties connected with this foreclos-ure, for our action is almost certainly final." I say our duties are more sacred and solemn than those of any others connected with this case, not only because our action is final, but for other and higher reasons. The highest court in the land, while making an allowance, deemed it necessary to adopt a point of broad scope in the syllabus of its decision, to emphasize prudence in this matter, in the strong language following: "The practice of allowing to trustees, complainants and receivers, and their counsel large and extravagant counsel fees and commissions, payable out of the trust fund under the control of the court, commented on and disapproved." *Trustees* v. *Greenough*, 105 U. S. 527. I venture to repeat what I wrote in the case of *Fowler* v. *Lewis Adm'r*, 36 W. Va. 154 (14 S. E. Rep. 447): "I certainly am disposed to be fairly liberal to my own profession, but not at the sacrifice of the interests of the many. I do not think it would confer a benefit upon that honorable profession, comprising the brightest men and leaders in society, trusted by the public with their most vital, sacred and important interests, private and public; but it would in the end bring the whole bar into disrepute and unpopularity, by the improper and cormorant use which would often be made of the rule by the least meritorious of its members. An abuse we know it has become where it prevails. The United States Supreme Court in *Trustees* v. *Greenough*, 105 U. S. 527, condemns the practice of allowing large fees out of trust funds now prevalent; and Mr. Justice Miller, in the same case, dissented, and called it a 'gross judicial abuse of the presnt day; namely, the absorption of the property or a fund which comes into the control of a court by making allowances for attorney's fees and other expenses.' "

In view of the increasing number of instances in this state, in these days of its progress and development, in which courts of equity are called upon to administer the assets of corporations and others, I have availed myself of this occasion to advert to principles which will be of frequent use in the courts. It might be thought that as the receiver has not shown that he has paid these counsel fees, but that the Nor-

folk & Western Railroad Company has, we could not allow anything on this score, since it is only allowed on the theory that it is an expense of the receivership, and the fee is allowed to the receiver, not to counsel. *Stuart* v. *Boulware*, 133 U. S. 78 (10 Sup. Ct. 242). But the receiver employed the counsel and other stockholders have incurred the expense in saving assets for the common benefit, and others ought to help bear the burden. *Trustees* v. *Greenough*, 105 U. S. 527.

Therefore, on this branch of the case, it only remains to say what shall be allowed for such counsel fees. Some of these counsel had, before they engaged to the receiver, engaged with certain stockholders, holding a large amount of stock to recover it, having fees in some case for one fourth, in some one half, of recovery, contingent wholly on recovery, which, under the dark clouds then lowering over their stock, were not unreasonable. It may be that these stockholders assented to the sum of two hundred thousand dollars. If so, that is their own act, but, of course, does not bind Scott's and Jewett's estates and McFadden, who stubbornly protest against any allowance to their prejudice; and we can not fix any sum approximating that sum, and thereby charge them on that basis by charging it on the fund. We do not intend to affect in any way any arrangement which may have been made between receiver and counsel and other stockholders; but as to McFadden and Scott's and Jewett's estates, we must treat the fund, so far as they are concerned, not being parties to any private arrangement, as money in court, and deal with it as a court of equity. We find that in 1882, long before the receiver was appointed and authorized to go into the Fidelity Company's suit to recover the debt due from the Shenandoah Valley Railroad Company, one of the firms of attorneys employed by the receiver (the receiver being a member of it) had filed a bill in the suit of Crumlish's administrator, as a stockholder in the Central Improvement Company, to assert that debt against the Shenandoah Valley Railroad Company, and success in that suit would have procured the fund for all. It does not appear what was the engagement between said administrator and his counsel. This is mentioned as a matter touching on the *quantum* of counsel fees.

Again, we do not see that so many as five different attorneys were essential. We fix eight thousand dollars as the sum to be paid by Scott's and Jewett's estates and McFadden proportionately as between themselves, for services redounding to their benefit for all fees of counsel. The receiver agreed on no fixed compensation with the attorneys, but it was to be left to the court. The amount, under any circumstance, would be within the discretion of the court. *Stuart* v. *Boulware*, 133 U. S. 78 (10 Sup. Ct. 242).

One of the attorneys for appellants makes the point that a certain contract bars any claim for counsel fees or receivers' commissions. A written agreement was made between certain attorneys for certain unnamed stockholders of the Central Improvement Company and the Norfolk & Western Railroad Company, whereby the Norfolk & Western Railroad Company purchased the holdings of said stockholders at the price of five hundred thousand dollars; and it contains a fourth section, providing that the attorneys and receiver in these suits should relinquish all claims for fees or commissions except such as were paid out of said five hundred thousand dollars, the receiver being aware of this contract, and signing an *addendum* relative to another clause. While I think that agreement would forbid attorneys and receivers from claiming any compensation from any stockholders other than those owning the stock sold by said agreement, yet, the agreement not including other stockholders, it seems to me it does not forbid the stockholders referred to in it from asserting an equity outside of it, of calling upon other stockholders to bear such part of the burden as a court of equity would deem fair. I regard this claim to charge other stockholders with counsel fees as one made by some stockholders to compel others to share their burden. This agreement, or any other for counsel fees, stands out to itself as made by parties competent to contract, and not binding on those standing out of such agreement.

The last matter for consideration is the allowance by the confirmed commissioner's report of a sum of one hundred and sixty thousand dollars out of the fund. I state the facts pertinent to this point. The Central Improvemnt Company ob-

tained a decree against the Shenandoah Valley Railroad Company for the large sum so often above spoken of; but it was second as a lien to another of, say five million eight hundred thousand dollars, including costs. It is said in evidence tending to show it that the Norfolk & Western Railroad Company owned or was in touch with this prior lien, and had formed a plan to buy the Shenandoah Valley Railroad at the then approaching sale, under decree, at a sum only covering the prior lien, and shutting out the debt of the Central Improvement Company, and thus that debt was in imminent, actual danger of total loss to creditors and stockholders. In this emergency the bulk of the stockholders of the Central Improvement Company came together, and passed a resolution authorizing a committee by them appointed to take steps in their discretion to secure payment of said debt with power to place the debt as security for any money it might be necessary to borrow, or to use a portion of the debt to secure financial assistance in the purchase of the Shenandoah Valley Railroad, if a purchase should be necessary. Under this authority, after fruitless efforts in other quarters, the committee made arrangements with the Memphis & Charleston Construction Company, backed by four individuals, by which it was to bid for the road a sum sufficient to cover the debt of the Central Improvement Company, for which service the Memphis &. Charleston Construction Company was to be paid two hundred thousand dollars. When the Norfolk & Western Railroad Company learned this, it agreed to and did bid a sum sufficient to cover the Central Improvement Company's debt. Afterwards the Memphis & Charleston Construction Company agreed to reduce the sum it was to get to one hundred and sixty thousand dollars, and it is this sum which was charged by said commissioner's report as a proper charge upon said fund. The receiver, as such, was not a party to this contract, but in evidence says it is a fair and proper charge, under the necessity of the case. He did not pay it as a receiver. It is the necessity of this expenditure to save the debt of the Central Improvement Company from absolute loss which is pleaded to charge it upon the funds. Such

loss might have come, but can we assert that necessity to have in fact existed? Can it be demonstrated to us, as a court, by mere opinion evidence, that such loss surely would have fallen? How can we say, with a safety or certainty warranting us in allowing such a charge, that the Shenandoah Valley Railroad, with a mileage of two hundred and fifty five miles, running from Roanoke City, Va., to Hagerstown, Md., through the length of the Shenandoah Valley, and its whole line through one of the very finest and most beautiful sections of the Republic, touching or crossing three great east and west trunk lines, and in easy and close reach of another, forming an artery of connection between the great cities of the North, Boston, New York and Philadelphia, and the South—how can we say that this road, on actual sale, open to free competitive bidding, would not have brought seven million dollars? If we should say so, it would be an arbitray guess, in a legal point of view. Counsel proposes as a test that if the court would have authorized it in advance, it ought now to be allowed, and asks whether the expenditure would not have been authorized by a court in advance. I answer that it would not. The court would let the property take its chances in the usual course at the open auction. Would a court, where a farm was to be sold for creditors having liens in different orders, at the request of some of the junior lienors, without the consent of others, make an order to pay a large sum to procure a bid, and charge it ratably upon those not consenting, so as to lessen their shares? This charge is so large a drain on the fund, and so extraordinary and out of the usual line and course of the administration of assets of an insolvent corporation by a court of equity, that a court would not allow it. It is not a charge fairly and reasonably incident to such administration. Certain ones of the stockholders authorized the expenditure. They had clear right to do so, but it was a sacrifice which they deemed prudent for the promotion of their own interests— their individual act, to save their own property; and the mere fact that their act resulted as a consequence in saving others interested is no reason for a court to charge an expenditure of that character and amount upon those not joining in the

act, and protesting against their interests being burdened with it. They had a right to stand out and run the risk of loss, and let others make a sacrifice personal to themselves if they chose. I have not met with or been cited to a case allowing a charge parallel with or analogous to this charge. The receiver has not paid it, nor could he have done so, for he can pay only such outlays as fall in the ordinary course of the business intrusted to him, such as are contemplated in his appointment. *Cowdrey* v. *Railroad Co.*, 93 U. S. 352; *Cowdrey* v. *Railroad Co.*, 1 Woods 331; Fed.Cas. No. 3,293. In extraordinary cases, involving a large outlay of money, the receiver should apply to the court in advance for authority to make the outlay. *Id.* It can not be allowed on the ground that the receiver has paid it, but only on the ground that other stockholders incurred the expense; but that, as I have said, as to this expenditure, is one chargeable only to them.

Therefore, I think the decrees of the 20th day of February, 1893, and of the 28th day of February, 1893, should be wholly reversed; and the decree of May 30, 1891, should be reversed; except that provision directing payment to U. L. Boyce of a certain debt therein specified in favor of John Lee; and so much of the decree of March 2, 1891, as may be construed to the prejudice of the rights of Charles McFadden and the estates of said Scott and Jewett should be reversed, and the cause remanded, that a decree may be made according to the principles herein indicated.